**Kenneth SIGNS, Appellant.**

v.

**BANKERS LIFE & CASUALTY COMPANY, Appellee.**

No. 15670.

Court of Civil Appeals of Texas.

Dallas.

Oct. 7, 1960.

G. H. Kelsoe, Jr., Dallas, for appellant.

Mays, Robertson & Bohannon, Dallas, for appellee.

YOUNG, Justice.

Rule 166–A, Summary Judgment Proceedings. The suit of appellant Signs in trial court reflects elements of distinct novelty. As an agent of defendant company, his claim is based on bulletins and oral representations of the company's branch manager; alleging a performance of the terms of said bulletins and oral representations, thereby becoming entitled to the sum of $10,000 in lawful United States currency, but instead was tendered payment in worthless Confederate money. Appellee's motion for summary judgment was supported by affidavits; the answer of plaintiff Signs likewise having his own affidavit in support. The court on hearing found an absence of "a genuine issue of any material fact," rendering judgment that plaintiff take nothing, followed by this appeal.

The first amended petition of plaintiff alleged a written contract with defendant to sell its insurance but that the instant suit was "based upon bulletins of the company furnished to the plaintiff and oral state-ments made by the branch manager of the company unto your plaintiff"; particular allegations being as follows: "Petitioner would show that near the end of November 1957, the Branch Manager of the respondent company herein, namely, C. R. Barner, did notify and advise your petitioner that the respondent company was going to distribute one million dollars to the deserving agents throughout this branch of respondent's company, stating that the reason for such distribution would be to aid the company in its income tax matters." Said branch manager further advised that the distribution of the one million dollars in the month of December 1957, would be made as follows: "All agents with a total Life volume in December of: (1) 10,000 or more will receive . . . $1,000 (2) 20,-000 or more will receive . . . $10,000 (3) 30,000 or more will receive . . . $50,000 (4) 40,000 or more will receive . . . $100,000. Petitioner would show that he, under the above plan, earned $10,-000 and that when the time for distribution came, viz. January 4, 1958, the same was postponed but that shortly thereafter, and after petitioner had been led to believe and to rely upon the representations of the branch manager of said respondent company, and after he had worked and earned the $10,000 he was advised and paid in worthless Confederate money. Petitioner would show that the representations which were made to him were reasonable, that he relied thereon, and that he performed under said representations so as to authorize him to receive $10,000 and thus your said petitioner has been damaged by virtue of the respondent company failing to fulfill said obligation in the sum of $10,000."

Though lengthy, affidavits of the respective parties must be quoted in greater part; first being that of C. R. Barner, Branch Manager of defendant, as follows:

"I have been employed by Bankers Life and Casualty Company for approximately nine years and since the month of October, 1953, have been Branch Manager of the Agency force

of said Company, and served in this capacity since February, 1956, at Dallas, Texas, and as such Branch Manager, subject to the approval of the Company, I interview agents and other personnel and submit their applications for employment for action to the home office, and supervise the servicing of policies in my Branch and promote, through agents, the securing of new business for the Company. I am not an officer of Bankers Life and Casualty Company and have no authority whatever to vary terms of agents' or other contracts made with the Company, but this must be done by an officer of the Company at its home office in Chicago.

"I am acquainted with the Plaintiff in this case, Kenneth Signs, and have known him since about the month of November, 1957; that on or about the 20th day of November, 1957, Kenneth Signs went to work for Bankers Life and Casualty Company as an agent under a written contract dated November 20, 1957, a copy of which is attached hereto marked Exhibit 'A' and made a part hereof the same as if copied herein in full; that Kenneth Signs worked under me in the Branch at Dallas, Texas, and I know of my own personal knowledge that the only contract he had with the Company is that contract, a copy of which is marked Exhibit 'A' and attached hereto; that Kenneth Signs only worked for the Company a short time and terminated his agency with the Company on or about the 1st of February, 1958.

"That part of my duties as Branch Manager are to hold sales meetings with the agents and district managers in my Branch and stimulate interest of the district managers and agents in carrying on their work in an efficient and business-like manner. In furthering these activities, we usually at the end of a calendar year, hold an annual seminar party for the agents and their wives which is a fun party, intended to bring the agents, their supervisors, and the company closer together.

"During the month of December, 1957, in preparation for our annual seminar party, which was tentatively set for January 4, 1958, we tentatively set a program with a bunch of fun promotions in order to stimulate interest among the agents. Among the promotions planned for this seminar party was a dead agents' song-fest. Any agent who had written less than $10,000 in life insurance for the month of December was automatically dubbed a dead head or a dead agent, and was required to join with a group of other dead agents and entertain his wife and the other guests at the party in singing a number of songs before the entire assembly. Among other things, we publicized that the wives of top life writers would be honored at the party with special orchid corsages and plans were made to place agents (and their wives) who wrote over $25,000.00 in life insurance during the month of December at a special table of honor. As a part of this fun program, about the 18th of December, 1957, I announced that we would have a mystery life contest and that a series of bulletins would be issued regarding the same. Following this up, I issued a bulletin announcing that a million dollars would be distributed at the seminar party on January 4, 1958, and announced that more details concerning this mystery and matters with the seminar would be forthcoming later. In this bulletin it was stated that an agent with a total life volume in December 1957 of $10,-000.00 would receive $1,000.00; those with a volume of $20,000.00 or more would receive $10,000.00; those with a volume of $30,000.00 or over would receive $50,000.00; and those with a volume of $40,000.00 or over would receive $100,000.00. This was strictly a fun contest which I set up for the pur-

pose of our seminar party and of which the home office in Chicago had no knowledge. I am familiar with life insurance premium rates and know that it would be impossible to pay such sums in spendable money for the volume of life insurance written, as to pay $100,-000.00 on a $40,000.00 volume of life insurance would take more than 100 years for the gross premiums collected on this amount of insurance to pay the Company this sum of money. In the sales meetings following this bulletin it was fully explained that this money was not spendable and the following day, December 20, 1957, an additional clue to this life contest was given to all agents wherein it stated that the clue to the one million dollars was 'it's the best ever printed in the South.' In all sales meetings, many of which were attended by Kenneth Signs, it was stressed that the one million dollars to be distributed was not spendable money, and it was a standing joke among all the agents, including Kenneth Signs, that they could light their cigars and cigarettes with $1,000.00 bills. This letter stating that the one million dollars was 'the best ever printed in the South' was given to the agents on three different occasions, to-wit, on or about December 20, December 23, and December 27, 1957.

"On one occasion, on or about December 27, 1957, Kenneth Signs came to me to discuss some personal problems and at such time stated to me that he, Kenneth Signs, knew that the money to be distributed was Confederate money and that even if it were spendable, it would not be sufficient to do him any good, as he had certain financial and domestic problems arising out of previous employment.

"I am familiar with the business solicited by Kenneth Signs and the applications he submitted, and know, of my own knowledge, that Kenneth Signs received commissions on the business

he did write under the terms of his written contract with the Company, Exhibit 'A' hereto. That the business written by Kenneth Signs was almost entirely upon a monthly premium basis and, while he was agent for the Company he submitted twenty-seven applications for insurance, one of which was rejected by the Company, and twenty of which lapsed for non-payment of the second monthly premium.

"Attached hereto marked Exhibits 'B' through 'P', inclusive, are affidavits of persons familiar with the Life Promotion during December 1957 and who knew Kenneth Signs and discussed this contest with him and to whom Kenneth Signs stated that he knew that the money to be given away was not spendable and had no value."

Affidavit of plaintiff Kenneth Signs is as follows:

"Your affiant was employed as an agent of Bankers Life and Casualty Insurance Company during the year 1957, and that after your affiant became employed by the Bankers Life and Casualty Company; vis. sometime in the latter part of November or December the Company, through its branch manager, C. R. Barner, issued a bulletin to your affiant stating that $1,000.00 would be distributed to agents having a total life volume in December as specified in said bulletin. The bulletin was most convincing in that it made reference to income tax purposes and in that it used the $ sign and never referred in any way to the fact that the money was not spendable. In truth and in fact the bulletin shows on its face that the Company was to distribute $1,000,000.00, and accordingly the said bulletin is attached to this affidavit and made a part hereof for all purposes.

"That later a second special bulletin was issued in this connection and once again no mention was made that the money was not spendable but rather

the second bulletin also inferred that actual U. S. Legal tender would be paid; this special bulletin is also attached to this affidavit and made a part hereof for all purposes; that it was not until the money was actually distributed that your affiant ever knew or was ever told that the money was not spendable, and that it was Confederate money; in fact the bulletin which was attached to the money made no reference to the fact that it was not spendable, and accordingly the said bulletin with the attached $10,000.00 in imitation Confederate money is attached hereto and made a part of this affidavit for all purposes.

"C. R. Barner was the branch manager of Bankers Life and Casualty Company in the Dallas, Texas office and was in complete charge of this office, and accordingly he, said C. R. Barner, being the branch manager and in charge of this office was vested with apparent authority to act for and on behalf of the defendant, Bankers Life and Casualty Company in that the said C. R. Barner controlled the operations of this office of the defendant, hired agents, fired agents and operated the business of the Company in this office; that further the bulletins which were issued by the branch manager were for the benefit of the defendant insurance company in that they were designed to promote and increase the sale of insurance, and thus the said insurance company placed its branch manager, C. R. Barner, in a position of apparent authority and is further estopped as a matter of law to deny his authority to make the said agreement with your affiant and to issue the bulletins which he (C. R. Barner) issued.

"Your affiant would further show that C. R. Barner or anyone else never told your affiant that the money to be distributed was imitation Confederate money, and that it was not spendable and that your affiant in good faith, acting upon the representations, statements and bulletins of the branch manager of the defendant, sold insurance of the defendant and qualified for $10,-000.00 from the said defendant, all as more fully set out in plaintiff's first amended petition and trial amendment which are in all respects incorporated herein and made a part of this affidavit.

"Your affiant would further show that he was never advised in any sales meetings that the $1,000,000.00 was not spendable money, and that it was a joke, but rather your affiant believed that the money was legal U. S. Currency and never knew to the contrary until he had fully performed under the terms of the bulletins issued by the branch manager of the defendant company."

The bulletins referred in the foregoing affidavit are shown in Footnote.[1]

1. "The distribution of $1,000,000 will be made shortly to deserving agents throughout our entire *Branch*. Because most people associate Security with Money, it seems only fair to give the money away in direct proportion to individual Life production.

"Recent newspapers have announced that there is presently more money in circulation in our local economy than at any previous time this year, certainly we want to take advantage of this fact.

"For reasons of income tax purposes the actual distribution will be made on Jan. 4th, 1958. This will also tie-in with our proposed Seminar Banquet on that date (more Seminar details later). Distribution will be made as follows:

"All agents with a total Life Volume in December of:
1. 10,000 or more will receive .. $1,000
2. 20,000 or more will receive .. $10,000
3. 30,000 or more will receive .. $50,000
4. 40,000 or more will receive ..$100,000
Special provisions will be made for awards to district managers on their individual Staff records.

"As you all know, our Region is in a very close contest with the North Central Region for first place for 1957. Mr. Haz-

The employment of plaintiff with defendant company appears to have continued from November 20, 1957 through to February 1, 1958; his commissions on monthly life policies being stated as 100% of first and second month's premiums. And "when semi-annual or annual premiums are collected with the application, further commissions, computed only on the additional amount of such premiums so collected, shall be retained by the agent—5% of additional first semi-annual premiums and 10% of the additional so collected on the first annual premiums". Paragraphs 8 and 9 of the agency contract provided as follows:

"8. The Company may, from time to time, pay a special bonus based upon the volume of business the Agent has in force at the end of each six months period. The formula for such bonus will be in the sole discretion of the Company. Any such bonus shall be and become due and payable when so declared by the Company, and then only if and upon the express condition that the Agent is at that time actively performing under the provisions hereof as an Agent of the Company. Nothing herein contained gives or shall be construed to give to the Agent any vested or earned interest or any claim in any such bonus, and it is clearly understood that the same may or may not be paid solely at the option of the Company. It may be withheld, increased, decreased, or discontinued at any time or times solely at the discretion of the Company.

"9. Upon the termination of this agreement, either with or without cause, all rights hereunder shall forthwith cease and terminate, including the right to receive collections, renewals, the payment of special bonuses, or other commissions, or compensation. The Agent agrees that nothing herein gives or is intended to give the Agent any right, claim, title or interest of any kind in or to any special accounts or funds established by the Company, including but not limited to any account which has as its purpose the promotion of the health, safety and welfare of its employees and agents, and that he has no right, title claim or interest therein."

It is not denied by plaintiff that he was paid commissions for all business written in accordance with provisions of his agency contract; also that he was at all times subject to its terms. His instant action is based entirely on the quoted subsequent bulletins wherein it is stated that defendant elwood and I are counting on maximum effort from everyone for the balance of this month. /s/ C. R. Barner.
"Special * * * Bulletin
"We have received word from the Home Office that, due to a number of improvements which are scheduled to be released within the next 2 weeks, they prefer that we Postpone our Seminar, originally scheduled for Saturday, Jan. 4th, until a later date.
"We realize that this may cause some inconvenience and wish to apologize for the sudden change in plans but, since we could not get the information by Saturday, the 4th, it was felt that everyone would profit by holding our meeting at a later date. We are tentatively thinking of our meeting early in February and will give you a definite date as soon as possible. The meeting will still be in Dallas at the Adolphus Hotel and, as mentioned, we will let you know as soon as a definite date is established.

"Distribution of the money mentioned in the recent life bulletin will be made at individual staff meetings as early in January as possible. This money was to have been distributed at the Seminar and rather than delay it until February we have decided to handle it on an individual basis.
"Congratulations to everyone for a tremendous job on life insurance this month and my best to you and your family for a Happy and Prosperous New Year. C. R. Barner, Br. Mgr.
"Attached is your share of the 1 million dollars being distributed as part of our December Life promotion. I want to take this opportunity to personally thank you for your efforts last month. I know you are very much aware of how important life insurance is to our Company's future and that is the same as saying our future. Again, my best to you and yours and keep up the good work.
"Sincerely, /s/ Ship."

intends to pay additional monies to "deserving agents * * * in direct proportion to individual life production." On the other hand, according to affidavit of branch manager Barner, the bulletins were solely with reference to a "fun program" or "mystery life contest" to be staged at the Company's Annual Agency Seminar; the million dollar distribution not to consist of spendable money (U. S. Currency); which fact was so understood by all agents including plaintiff. These bulletins on their face, if viewed as bona fide representations by the Company, were comparable to literature of the Horatio Alger type; promising, as they did, to all agents having a $40,000 maximum of new life insurance sales for December 1957, to a further and special award of $100,000 in cash. For himself, plaintiff alleges under oath that he believed and relied on such bulletins, selling new insurance to extend to $20,000 or more, becoming thereby entitled to the additional sum of $10,000; not denying however that he had been duly paid commissions thereon as provided in his agency contract. He says that "he was never advised in any sales meetings that the one million dollars was not spendable money and that it was a joke, but rather your affiant believed that the money was legal U. S. Currency and never knew to the contrary until he had fully performed under the terms of the bulletins issued by the Branch Manager of the defendant company."

In this connection, appellant asserts court error in grant of summary judgment in that fact questions were implicit in his answering affidavit; and cites the following rules: that "On appeal from a summary judgment rendered against plaintiff, plaintiff's testimony and factual allegations of his pleadings would be accepted as true." Starr v. Ripley, Tex.Civ.App., 265 S.W.2d 225, Syl. 1. "Upon appeal from summary judgment awarded defendant, it becomes necessary to determine whether case presents a dispute on a material fact issue." Zamora v. Thompson, Tex.Civ. App., 250 S.W.2d 626, Syl. 2. The fact

issues thus suggested are: (a) authority of branch manager Barner; (b) whether or not appellant believed the bulletins to be a joke; and (c) whether or not appellant was advised that the bulletins were a joke.

In appellant's brief he deals with these bulletins on basis of a contract, supplemental to the original agency contract of November 20, 1957. The million dollars, so called, of company money undoubtedly constituted a special fund or bonus, defined in Webster's New International Dictionary, Second Edition, as "Something given in addition to what is ordinarily received by, or strictly due to, the recipient." Likewise appellant's agency contract is unambiguous and its construction and effect, a matter for the court to interpret. Under his contract of agency, appellant was to receive commissions for all new business produced "as full and complete compensation," which commissions have been duly paid. Manifestly his right to increased compensation, perforce of a purported supplemental contract, must be based upon a sufficient consideration; the applicable rule being that "where a party agrees to do what he is already bound to do by the original contract, there is not a sufficient consideration to support a supplemental contract or modification." 10–A Tex.Jur. p. 443. Stone v. Morrison & Powers, Comm. of Appeals, opinion adopted by Supreme Court, 298 S.W. 538.

Moreover, appellant's right to the $10,000 demanded is limited by Sections 8 and 9 of his agency contract which deal with special funds and bonuses that the company might in its discretion pay; providing therein that same are payable solely at option of the company, the agent never having any vested or earned interest in the same. And while Section 8 relates to a "special bonus based upon the volume of business the agent has in force at the end of each six months period"; yet in Section 9 appellant "agrees that *nothing herein gives or is intended to give the Agent any right, claim, title or interest of any kind*

*in or to any special accounts or funds established by the Company,* including but not limited to any account which has as its purpose the promotion of the health, safety and welfare of its employees and agents, and that *he has no right, title, claim or interest therein."* (Emphasis ours.) In a conclusion of affirmance we need only reiterate our holding in Schroeder v. Texas & Pacific Ry. Co., Tex.Civ.App., 243 S.W. 2d 261, 263, that "Turning to plaintiff's petition and assuming the truth of all facts alleged, the trial court has simply concluded that no cause of action was stated. The matter of sufficiency of the evidence raises an issue of law; and if, assuming due proof of the pleaded facts, the court would later be required to direct a verdict for the moving party, the situation is properly one for a summary judgment. Hurd v. Sheffield Steel Corp., 8 Cir., 181 F.2d 269, Syls. 1–3. Appellant cannot complain of any lack of due process, i. e., trial by jury, when his own pleading in effect involves merely questions of law."

Judgment of trial court is accordingly affirmed.