**LONE STAR STEEL COMPANY, Appellant,**

v.

**John SCOTT, Appellee.**

No. 9577.

Court of Appeals of Texas, Texarkana.

June 28, 1988.

Rehearing Denied Sept. 20, 1988.

Stephen F. Fink, Thompson & Knight, Dallas, for appellant.

Rick Harrison, Jones, Day, Reavis & Pogue, Austin, for appellee.

CORNELIUS, Chief Justice.

John Scott sued his employer, Lone Star Steel Company, because of its failure to pay him for a suggestion he made which improved slag removal efficiency and increased operating time in the company's steel soaking pits. The jury found for Scott on theories of contract breach, unjust enrichment, fraud, and estoppel. Scott was awarded $3,016,699.00 actual damages, $3,016,699.00 exemplary damages, and $2,315,851.26 prejudgment interest and attorney's fees, for a total of $8,349,249.26. Lone Star brings fifty-two points of error attacking the judgment and various rulings of the trial court. We find that the judgment for actual damages should be sustained on the breach of contract findings, but that the award of exemplary damages must be eliminated from the judgment because there is no proof of an independent tort accompanying the breach of contract or actual damages resulting from tort.

## VENUE

At the threshold, we will discuss Lone Star's first point by which it contends that the judgment should be reversed because the trial court failed to transfer the case in response to Lone Star's uncontested motion for change of venue.

At docket call on January 5, 1987, Lone Star announced ready for trial. The case was set for trial at 9:00 a.m. on January 12, one week later. On that day at 8:55 a.m., Lone Star filed a written motion to transfer venue pursuant to Tex.R.Civ.P. 257, on the ground that there existed in Morris County and surrounding counties so great a prejudice against it that it could not

obtain a fair trial. The motion was supported by the affidavits required by Rule 257. Scott did not file any affidavit opposing the motion. The trial then apparently proceeded as scheduled, with no separate hearing on the motion to transfer. The trial court orally denied the motion on January 15 and issued a written order to that effect the next day. A corrected order was filed on May 18, 1987. In its order the trial court found that the motion to transfer was not timely filed, that it was filed for the purpose of delay, that the events creating the alleged prejudice occurred several weeks before Lone Star's announcement of ready, and that at least one attorney for Lone Star had been aware of the alleged prejudicial events since they occurred.

Tex.R.Civ.P. 257 provides in part that:

A change of venue may be granted in civil causes upon motion of either party, supported by his own affidavit and the affidavit of at least three credible persons, residents of the county in which the suit is pending, for any following cause:

(a) That there exists in the county where the suit is pending so great a prejudice against him that he cannot obtain a fair and impartial trial.

Tex.R.Civ.P. 258 provides in part:

Where such motion to transfer venue is duly made, it shall be granted, unless the credibility of those making such application, or their means of knowledge or the truth of the facts set out in the said application are attacked by the affidavit of a credible person; when thus attacked, the issue thus formed shall be tried by the judge; and the application either granted or refused.

Rule 258 is mandatorily operative, and if the motion for transfer is duly filed and is not challenged as provided in the rule, the trial judge is required to transfer the case. *City of Abilene v. Downs*, 367 S.W.2d 153 (Tex.1963); *Freeman v. Ortiz*, 136 S.W. 113 (Tex.Civ.App.1911), *aff'd*, 106 Tex. 1, 153 S.W. 304 (1913). Rule 258 presupposes that, if the motion stands unchallenged, a change of venue is necessary in the interest of justice, and the failure to transfer the case in those circumstances is undoubt-

edly error. It is equally well settled, however, that a judgment is not to be reversed for an error of law, unless the error amounts to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment, or probably prevented the appellant from making a proper presentation of the case on appeal. Tex.R. App.P. 81.[1] The harmless error rule, as expressed in Rule 81, applies to all errors, even those involving the violation of procedural rules couched in mandatory language. *Lorusso v. Members Mutual Insurance Co.*, 603 S.W.2d 818 (Tex.1980); *C.E. Duke's Wrecker Service, Inc. v. Oakley*, 526 S.W.2d 228 (Tex.Civ.App.–Houston [1st Dist.] 1975, writ ref'd n.r.e.). While the harmless error rule has not, to our knowledge, been applied to violations of Rule 258, the courts have held that the mandatory provisions of that rule may be waived by one in whose favor it would operate. *See Grozier v. L–B Sprinkler & Plumbing Repair*, 744 S.W.2d 306 (Tex. App.–Fort Worth, 1987, writ denied). This fact, together with the well-recognized principle that all of the Rules of Civil Procedure stand on equal footing unless they provide otherwise, leads us to conclude that the provisions of Rule 81 apply to violations of Rule 258 the same as to other errors. Having accepted that proposition and having carefully examined the jury selection process as reflected in the record, we conclude that the error in failing to transfer the case was not calculated to cause and did not cause the rendition of an improper judgment.

Forty-five panel members were examined during voir dire. They were all examined about any prejudice they may have had against Lone Star because of the company's lay-offs, disputes over its retirement policies, or for any other reason. All denied that they had any bias or prejudice. Only seven of the forty-five panel members

had ever worked for Lone Star, and only three had heard about the lawsuit. Lone Star challenged none of the panel members for cause. We think these facts clearly indicate that Lone Star was not prejudiced by the jury's composition, and that the error in failing to grant its motion to transfer was harmless under the provisions of Rule 81.

## THE FACTS

Lone Star began operating a suggestion plan in 1962, whereby its employees could receive monetary awards for suggestions which resulted in increased production or savings. Scott was employed in 1966 as a brick mason. In 1975, he submitted a suggestion concerning the operation of the soaking pits where steel ingots must be heated to a uniform temperature before they can be rolled into slabs and coils. The soaking pits are large masonry pits with movable covers. The steel ingots stand on the floor of the pit and are brought to the proper temperature ("soaked") by circulating hot gases around them. The gases come from a natural gas burner set in the wall of the pits and escape through a vent, an arched opening in the bottom of the back wall of the pit, and into tunnels leading to smokestacks. Heating the ingots produces slag, a molten material that runs off the ingots while in a semi-liquid state and onto the floor of the pit. The slag hardens and accumulates in the pits until it eventually must be removed.

When Scott made his suggestion, the procedure Lone Star used for slag removal required workers to enter the cooled pits and use jackhammers to loosen the solidified slag, which was then either dropped into the pit basement through doors in the floor of the pit or taken out through the top of the pit. While they were being cleaned the pits could not be used, and the production of marketable steel was delayed

1. *Improper* venue cannot be harmless error. Tex.Civ.Prac. & Rem.Code Ann. § 15.064(b) (Vernon 1986). The error here, however, was not improper venue. Venue was proper in Morris County. Tex.Civ.Prac. & Rem.Code Ann. § 15.036 (Vernon Supp.1988). The error here was failure to order a change of venue because of local prejudice. *See* 3. R. McDonald, *Texas Civil Practice in District and County Courts* § 10.19 (rev. 1983). Lone Star did not file a statutory motion for transfer at the time of or before answering. Tex.Civ.Prac. & Rem.Code Ann. § 15.063 (Vernon 1986).

until the pits were again operational. The intense heat in the pits during operation and the process of removing the solidified slag by jackhammers damaged the brick-work of the pits. From time to time Scott, as a brick mason, helped repair the damaged brickwork. While performing that work, he conceived his idea for slag removal.

In summary, Scott's suggestion was that the floor of each soaking pit be inclined toward the downtakes and that a "slag runner," which was a grooved tile funnel, be placed in the floor to allow molten slag to run into the funnel and out into the downtakes. His design also called for a gas burner or "lance" to be mounted in the downtake, directed toward a notch cut in the bridge wall, to keep the slag fluid as it exited the bridge wall so that it would continue to flow out of the pit and into the downtake. Scott further proposed that part of an ingot mold be placed in the bottom of the downtake to catch the molten slag as it ran into the downtake. The ingot mold was to function as a kind of waste-basket which could be removed and replaced with another ingot mold after it had filled with slag.

Before Scott submitted his suggestion, he was warned by one of his supervisors that he could not be paid for his suggestion under the company's suggestion plan, because the idea had been discussed previously by others at the company. Nevertheless, he was told to take his suggestion to Robert Hurtte, who administered the suggestion plan for Lone Star. After his visit with Hurtte, Scott submitted his plan in writing on forms furnished by Lone Star. By a notice dated January 26, 1977, Scott was told that his suggestion had been rejected by the suggestion review committee. The reason for the rejection stated on the form was: "This has been considered previously by Management and/or another suggester."

Since he had been told that his suggestion could not be adopted, Scott wrote to Lone Star in May of 1977 asking it to release any rights it had in his suggestion so that he could develop it on his own. The company refused, and so advised him by a letter in which Lone Star's plant attorney observed that it was the company's policy not to release its rights to inventions or ideas discovered by its employees during and in relation to their employment. He also pointed out that the suggestion form itself, which was signed by Scott when he submitted his suggestion in writing, contains the statement that all suggestions become the property of Lone Star.

Additional evidence, viewed most favorably to Scott's case, revealed the following: Scott continued to believe in and further develop his idea. He asked Albert Bridwell, who was acting foreman in the masonry department, to set up a meeting with Jerry Sheehan, who was manager of the rolling mill. In early 1979, Scott met with Sheehan, Charles Coleman, and Jim Jennings, who was then general foreman of the masonry department. Scott explained his design and told Sheehan that he could remove slag from the soaking pits while the pits were still operating. Jennings gave his opinion that the idea would not work, but Sheehan told Jennings and Coleman to let Scott install his design in the next pit that had to be shut down and cleaned out because of slag build-up. Scott's suggestion was not implemented at that time, but Sheehan was instrumental in later obtaining final approval to have the idea tried.

In December 1979, Scott was approached by Bridwell. He said, "John, these soaking pits are eating us up." Scott described his idea once again for Bridwell and assured him that his idea would remove the slag better than the jackhammer method. Following this conversation, Lone Star authorized and instructed Scott to install his design in one pit.

Scott again went to see Robert Hurtte, the administrator of the suggestion plan, because he wanted his suggestion to be considered for an award. Scott explained that he had met with some of Lone Star's officials and they had decided to let him install his slag runner design. Hurtte responded, "Well, John, looks like you are

going to get to put your project in after all."

Scott's meeting with Bridwell occurred on Christmas Day of 1979. On the day after Christmas, Scott worked seventeen hours beginning to redesign and rebrick Pit No. 1 in accordance with his idea. The next day he spent five hours in the pit downtake putting in his "catch box" to catch the slag as it ran out of the pit. The box was a revision of his earlier idea to use an ingot mold to catch the slag. After Scott completed his redesign of Pit No. 1, he was asked to keep watch over the pit in addition to performing his regular duties. He testified, "We watched it from time to time for two or three days and the slag started running down in this little box just like you open a faucet of water, just a solid stream, and when this thing got a pretty big piece [formed inside], we would go under there and take it out. . . ." The operation of the newly modified soaking pit was also observed by several senior employees and officials of Lone Star, including Ernest Stebbins, L.K. Doty, Jerry Sheehan and Bob Scott. Stebbins, who was then works manager and the second highest ranking plant official, remarked that the idea was "fantastic." Doty, who supervised Scott's work at the soaking pits, concluded that the idea "had an awful lot of merit, because it did—it did the job of removing the slag. . . ."

After the successful trial of Scott's idea in Pit No. 1, Doty instructed him to convert the remaining fifteen pits in accordance with his suggestion. As each pit had to be shut down for slag clean-out, Scott complied. He also made improvements in his design. Instead of replacing loose bricks in the walls at the bottom of the downtakes each time a load of slag was removed, he installed doors specially made with kayo wool through which the workers used forklifts to efficiently remove the slag that had flowed over the pit bridge wall and then hardened on top of sand placed in the bottom of the downtakes. Scott worked all hours at the plant while he modified the pits and afterward while he oversaw the pits' continuous slag removal system. He continued to work his assigned shift, but

also regularly returned from home to the plant to check the pits. Sheehan arranged for Scott to have a car pass so that he could freely come and go to observe the modified pits. His reason for doing this was, "Since it was Mr. Scott's idea I wanted Mr. Scott to be there to see what was happening."

According to Scott's evidence, the conversion of all sixteen soaking pits to the new design proved highly successful. In 1980, the pits were able to process all the ingots that had been stacked up in the ingot bank and to keep a steady supply of steel for processing through the rolling mill and the pipe mills. Mr. Stebbins observed that the sixteen pits with Scott's slag runner design were the equivalent of twenty-two pits without the design. Although the number of soaking pits had increased from twelve to sixteen between the years 1979 and 1980, the number of pit clean-outs fell from 212 in 1979 to 62 in 1980. Lone Star, by a conservative estimate, calculated that the reduced down-time for slag clean-outs added 180 more days of pit availability per year. Three hundred thousand more tons of ingots were processed through the soaking pits in 1980 than in 1979. As a result, in 1980 the company set eleven new performance records, including records from the operation of the soaking pits.

Scott produced expert testimony that the adoption of his suggestion produced approximately $60,000,000.00 in extra profits to Lone Star during the first year.

When Lone Star's company magazine, *Starlight*, published an article saying that another employee had received the top award for suggestions in the year 1980, Scott became concerned that his award had been overlooked. He went to L.K. Doty, the supervisor of the soaking pit area, to discuss the amount of his award. After doing some preliminary figuring, Doty told Scott that his award would be "phenomenal."

In April of 1981, Scott visited Jerry Sheehan about payment for his idea. Sheehan told him that he would evaluate the savings from the pits' performance with the new

slag removal design in place through June of 1981 and pay Scott based on that evaluation, and then would reevaluate the project again at a later date and pay Scott again later. Two months later, Scott went to see Sheehan again, and this time Sheehan told him that he would not pay Scott for the new slag removal design, although the plant was going to continue to use it. After Sheehan's statement, Scott left the soaking pits and returned to his job in the masonry department. He then told Hurtte about Sheehan's statement. Hurtte responded that Sheehan had no business telling Scott that he would not be paid for his design. He further stated that Lone Star would have to pay him for his idea or shut down the entire suggestion plan. At some point in their discussions Hurtte had told Scott that an award under the suggestion plan would be five percent of the savings it produced the first year.

During 1981 and 1982, although Lone Star's officers considered that Scott's idea did not meet the established eligibility criteria under the suggestion plan, they discussed the fact that he had pushed an idea others lacked faith in, and it had apparently succeeded. There were discussions about putting his picture in *Starlight* and paying him something outside of the suggestion plan to recognize his efforts. J.B. Jennings, then vice-president of the plant, and Jerry Chapman, an industrial engineer, met with Scott on December 2, 1981. During that meeting, Jennings told Scott that he was going to reconsider whether the steel company would pay for the idea. Scott, who had refused to return to work in the soaking pits unless he was paid for his suggestion, said he was ready to return. A few days later, however, Jennings suffered an incapacitating stroke. He never returned to the plant, and died several months later. Stebbins took his place as vice-president.

Scott next talked with Hurtte, who told him that Stebbins had decided to pay him the top award ever given under the plan and then rewrite the plan to make the maximum cash award $50,000.00. At trial Hurtte testified that Stebbins said he wanted to pay Scott $10,000.00 and write an article in *Starlight* giving him credit for working diligently in the installation of his suggestion, but he was afraid Scott would be embarrassed or insulted by the $10,-000.00 payment and file suit against the company. Stebbins died in April of 1982.

In October of 1982, the suggestion plan committee reconsidered Scott's suggestion, apparently at his request. The committee was told that because there had been changes made at the soaking pits since 1977 and Scott claimed that those changes had involved his idea, his suggestion should be reconsidered. The committee heard no new information that refuted its 1977 decision that the idea was not original, and it heard from several technical people involved with the soaking pits who said that the experiment with this method of slag removal had failed because it was causing too much damage to the facilities, and that it was going to be discontinued. The committee thus let stand its original decision rejecting Scott's suggestion.

## THE JURY FINDINGS

In answer to special issues, the jury found that Scott submitted an idea which Lone Star adopted and which resulted in increased production or cash savings; that Lone Star made an agreement with Scott to pay him for the idea; that Scott complied with the agreement, but Lone Star did not; and that $3,016,699.00 was the amount Lone Star would have paid had it complied with the agreement. The jury also found that Lone Star falsely represented to Scott that it would pay for his suggestion; that it acted with malice in making such representation; that Lone Star was unjustly enriched by using Scott's idea; that Lone Star was estopped to contend that Scott's suggestion was not eligible under the suggestion plan; and that by finding his suggestion ineligible, Lone Star failed to administer its suggestion plan in good faith. Damages for false representation, unjust enrichment, and for punishment were each found to be the same as for breach of contract—$3,016,699.00. The date the contract was breached was found to be January 1, 1982.

## BREACH OF CONTRACT

Lone Star contends in several of its points of error that Scott's recovery on a breach of contract theory cannot be sustained because as a matter of law there was no contract, and in any event there is insufficient evidence to establish the essential elements of a contract. These contentions are based on the terms of the suggestion plan which Lone Star contends conclusively demonstrates that there was no intent to be bound, no definite promise, no consideration, and that performance by Lone Star was entirely optional.

The suggestion plan is described in a document titled "Lone Star Steel Company's Suggestion Plan." The document was not distributed to employees, but a brief description of it is contained in a manual for new employees. It was also described in the November 1962 issue of *Starlight*, the company newspaper, when the suggestion plan was initiated. Successive issues of *Starlight* elaborated on the provisions and operation of the plan.

In arguing that there was no binding contract, Lone Star relies particularly on the following provisions of the suggestion plan as it is contained in the basic document.

A suggestion will not be awardable if it is received after general company action has started on the same subject.

. . . .

AWARD AMOUNT.

1. Tangible Suggestions

A tangible suggestion is one which will result in actual cash savings during the first year after implementation.

. . . .

. . . No action which the company might take shall be deemed to constitute an agreement to pay for an ineligible suggestion.

. . . .

By submitting a suggestion, an employee waives any right to compensation for use of the suggestion except under the terms of the Suggestion Plan, . . . .

The processing of a suggestion . . . under the Suggestion Plan shall not be deemed a waiver of any rights which Lone Star Steel Company may have to the subject matter of the suggestion.

Lone Star Steel Company reserves the right to change the Suggestion Plan at its discretion. Any decision of the company concerning the terms or administration of the plan, including the eligibility of suggestions and the amount of any awards made, is final.

Additional features of the plan were discussed in *Starlight*. For example, in the November issue:

Cash awards will be paid for all suggestions adopted. Awards for suggestions which result in savings to the Company, or in greater production or better quality, will be based on a percentage of the savings during the first year the suggested change is in operation. The minimum award will be $5. The maximum is governed only by the value of the employee's suggestion, but could amount to thousands of dollars for a valuable idea. No award is to be granted unless the suggestion is adopted and installation has been initiated.

. . . .

Suggestions will be processed as rapidly as possible, and necessary investigations conducted as quickly as they can effectively be carried out. Employees will be notified of the status of their suggestion when such studies require more time than normal. In some cases, it may be necessary to put a suggestion into practice and operate it for several months before a determination of its value and the savings it accomplishes is possible. Awards will be made as soon as such experimentation is completed.

. . . .

A suggestion and all ideas embodied therein become the absolute and exclusive property of the Company upon submission.

. . . .

All decisions of the Company with respect to eligibility, the adoption of suggestions, the making of awards, or the interpretation of the Suggestion Plan shall be final and binding on all parties.

Lone Star correctly points out that suggestion plans or other employee benefit plans which expressly make performance optional on the part of the employer, express an intent not to be bound, or which amount to mere gratuities do not constitute binding contracts. *Long v. Southwestern Bell Telephone Company,* 442 S.W.2d 462 (Tex.Civ.App.–San Antonio 1969, writ ref'd n.r.e.); *Parrott v. Brotherhood of Railroad Trainmen,* 85 S.W.2d 306 (Tex.Civ.App.–Texarkana 1935, writ ref'd); *Rieden v. Brotherhood of Railroad Trainmen,* 184 S.W. 689 (Tex.Civ.App.–San Antonio 1916, writ ref'd); *Calkins v. Boeing Company,* 8 Wash.App. 347, 506 P.2d 329 (1973). Where performance under a suggestion plan is left to the discretion of the employer, there is no cause of action for failure to perform absent proof that the employer's discretion was exercised in bad faith. *Moore v. General Motors Corp.,* 558 S.W.2d 720 (Mo.Ct.App.1977); *Schott v. Westinghouse Electric Corporation,* 436 Pa. 279, 259 A.2d 443 (1969). However, suggestion plans which provide or represent that an award will be paid for suggestions adopted and used may constitute valid unilateral contracts which become binding when accepted and performed by the promisee. *Carlini v. United States Rubber Company,* 8 Mich.App. 501, 154 N.W.2d 595 (1967).

Although Lone Star's basic suggestion plan is couched in purely optional or discretionary terms, there is sufficient evidence that later modifications of the plan in the form of *Starlight* newspaper announcements and agreements by Lone Star's officers constituted an agreement to pay some award if an idea was actually adopted and used. The November 1962 issue of *Starlight* is especially convincing: "Cash awards *will be paid* for all suggestions *adopted.*" (Emphasis added.) *See Douglass v. Panama, Inc.,* 504 S.W.2d 776 (Tex. 1974); *Danaho Refining Company v. Dietz,* 398 S.W.2d 307 (Tex.Civ.App.–Corpus Christi 1965, writ ref'd n.r.e.); *Signs v. Bankers Life & Casualty Company,* 340 S.W.2d 67 (Tex.Civ.App.–Dallas 1960, no writ); *see also,* Annot., 40 A.L.R.3d 1416 (1971).

Lone Star argues that no contract existed because (1) Scott did not read the November 1962 *Starlight* article until after he filed the lawsuit, so he could not have accepted the offer; (2) Scott's idea was not eligible because it was not original; (3) the promise is too indefinite, especially as to the amount of an award; (4) there was no consideration; and (5) later modifications of the plan were not effective because the plan expressly prohibited them.

The fact that Scott did not know of the November 1962 *Starlight* article until after the lawsuit was filed does not defeat his right of contract. He was aware of the general nature of the suggestion plan and its scheme of awards. It was not necessary that he know all of its terms or modifications in order to accept the offer by his performance. *Restatement (Second) of Contracts* § 23 comment e (1981).

As for the argument that Scott's idea was ineligible because it was not original, we find no requirement in the plan for originality. The plan speaks of eligibility, which was apparently left to the decision of the awards committee. This requirement too, however, was subject to the subsequent modifications that all ideas adopted would be paid for. It is undisputed in this record that Lone Star did adopt Scott's suggestion. Moreover, there is evidence that even if an idea was not original, if the earlier suggestion had not been adopted within two years of the other's submission the latter idea would become eligible.

Lone Star argues that the promise was too indefinite to constitute a contract. The basis of that contention is that the suggestion plan left the amount of any award solely in the discretion of the awards committee. It is recognized, however, that the failure of a contract to specify the amount of payment does not render it ineffective. In such a case the law will imply that a reasonable amount was intended. *Bendalin v. Delgado,* 406 S.W.2d 897 (Tex. 1966). And although the determination of what is reasonable was placed in the discretion of Lone Star's suggestion committee, the committee cannot void the contract by

refusing to exercise that discretion. If the committee refuses to set the amount, it is deemed to have waived that right, and to have left the matter to determination by the court. *Aycock v. Vantage Management Co.*, 554 S.W.2d 235 (Tex.Civ.App.– Dallas 1977, writ ref'd n.r.e.); *see also, Young v. Warren*, 444 S.W.2d 777 (Tex. Civ.App.–Beaumont 1969, writ ref'd n.r.e.).

■ There is evidence of consideration for the agreement. Although when he was employed Scott signed an agreement assigning to the company all inventions and ideas he conceived while employed there, he was not obligated to conceive or develop any such idea. He was a brick mason who had no duty to seek a solution to the slag build-up in the soaking pits, and it is conceded that his efforts in doing so were beyond the scope of his original duties. The fact that he chose to conceive, design, develop and implement the slag removal scheme in order to increase Lone Star's production quantity and efficiency constituted a benefit to Lone Star and constitutes sufficient consideration for its agreement to pay. As Lone Star concedes in its brief before this Court, although the company had title to all of its employees' ideas, it "evidently saw a need to encourage employees to share their ideas with the company," and thus designed and announced the suggestion plan with its scheme of awards. If a performance includes something that is not within the promisee's preexisting duty, the requirement of consideration is satisfied. *Restatement (Second) of Contracts* § 73 (1981); 1A *Corbin on Contracts* § 192 (1963).

■ Lone Star also argues that subsequent modifications of the suggestion plan or subsequent agreements by its officers could not be effective because the plan itself provided that no action taken by the company could constitute an agreement to pay for an ineligible suggestion. A provision of that nature, however, like similar nonwaiver provisions, is itself subject to modification or waiver by subsequent agreements. For example, unless the contract is one which by statute is required to be in writing, written provisions against

alteration or waiver may themselves be waived, modified or changed by subsequent oral or written agreements. A written agreement is of no higher legal degree than an oral one, and either may vary or discharge the other. *Morrison v. Insurance Co. of North America*, 69 Tex. 353, 6 S.W. 605 (1887); *Group Hospital Services, Inc. v. One & Two Brookriver Center*, 704 S.W.2d 886 (Tex.App.–Dallas 1986, no writ); *Hyatt Cheek Builders v. Board of Regents*, 607 S.W.2d 258 (Tex.Civ.App.–Texarkana 1980, writ dism'd).

In another point Lone Star argues that there can be no recovery because Scott failed to secure a jury finding that Lone Star acted in bad faith in declaring his suggestion ineligible. We believe this point is immaterial in view of the jury finding that Lone Star agreed to pay Scott for his suggestion and failed to do so. Bad faith becomes an essential element of a breach of contract action only when the contract places performance solely and absolutely in the discretion of one party. In that case, recovery can only be had if the party exercised its discretion in bad faith. As noted previously, however, in this case there is evidence of subsequent agreements or modifications to the effect that an award would be paid for any idea adopted, and the jury so found. The question of a bad faith exercise of discretion was thus not material.

## LIMITATIONS

■ Lone Star contends that Scott's action is barred as a matter of law by the four-year statute of limitations, Tex.Civ. Prac. & Rem.Code Ann. § 16.004 (Vernon 1986), because he knew no later than February of 1977 that the company had declared his suggestion ineligible. Aside from the eligibility argument, however, the jury found that Lone Star agreed to pay Scott for his idea and failed to do so. An action for breach of contract accrues when the contract is breached, *Jackson v. J.R. Neatherlin Corp.*, 557 S.W.2d 327 (Tex.Civ. App.–Houston [1st Dist.] 1977, writ ref'd n.r.e.), or when the claimant has notice of facts sufficient to place him on notice of

the breach. *Maddox v. Oldham Little Church Foundation*, 411 S.W.2d 375 (Tex. Civ.App.–Tyler 1967, writ ref'd n.r.e.). The jury here found that the breach occurred on January 1, 1982.

There is evidence that Lone Star agreed to pay for suggestions which were adopted. The implementation of Scott's suggestion in all of the soaking pits was completed in April of 1980. Scott testified that he was told by Lone Star's officers that he would not be paid until the design had been in place for some time and the savings had been evaluated. There is also evidence that the payment would be based on a percentage of savings experienced during the first year of operation. There is, therefore, evidence that the breach of the obligation to pay did not occur until mid- or late–1981 at the earliest. This action was filed in January of 1983, less than four years after that time.

### UNJUST ENRICHMENT

We agree with Lone Star that a recovery by Scott on findings of unjust enrichment cannot be upheld. Although Scott characterized his theory as unjust enrichment, it actually stated a right to recover in quantum meruit. *See Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80 (Tex. 1976). Recovery on either unjust enrichment or quantum meruit is recovery on a quasi-contract or a contract implied in law, and there can be no recovery on either if the same subject is covered by an express contract. *Truly v. Austin*, 744 S.W.2d 934 (Tex. 1988); *Black Lake Pipe Line Co. v. Union Construction Co.*, supra; *Davidson v. Clearman*, 391 S.W.2d 48 (Tex. 1965); *Woodard v. Southwest States, Inc.*, 384 S.W.2d 674 (Tex. 1964). Scott could not recover on either quantum meruit or unjust enrichment, because if there was an express contract to pay for his idea, as the jury found, that governs the transaction; if there was not such an express agreement, Lone Star owned Scott's idea under another express contract, the invention assignment, and there was no unjust receipt by Lone Star of any benefit.

### ESTOPPEL

We also find the evidence legally insufficient to support a recovery on the basis of estoppel, because there is no evidence of any detrimental reliance by Scott which resulted in damages to him.

We disagree with Lone Star that there could be no estoppel in any event. It is true that estoppel cannot create a contract where none existed, *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726 (Tex. 1981), but estoppel can operate to prevent a party to an existing contract from exercising or insisting upon one of the contractual terms or limitations. *Wheeler v. White*, 398 S.W.2d 93 (Tex. 1965). In this case, had there been the requisite reliance and resulting damage, Lone Star could have been estopped from claiming that Scott's idea was ineligible under the suggestion plan. But there is no evidence of detrimental reliance by Scott on any representation or conduct on Lone Star's part. Scott owed his idea to Lone Star and had assigned it to Lone Star. The only detrimental reliance he could have had because of a representation was the extra time and effort he spent in developing and implementing his idea. There is no evidence of damages resulting from those activities, and there was no jury finding requested or made as to any damage resulting from them. The only evidence of damages was the suggestion's value to Lone Star.

### CONTRACT DAMAGES

Lone Star levels an attack on the breach of contract damage award. It argues that the jury's finding of $3,016,-699.00 actual damages cannot be sustained because it rests on two bases, neither of which is competent or sufficient evidence of damages in the context of this case. These two bases are that the use of Scott's suggestion was responsible for approximately $60,000,000.00 in increased profits to Lone Star in the first year, and that the reasonable value of Scott's design was five percent of the first year's savings or increased profits.

There was testimony from Scott's expert witness, Mr. Ludwig, based in part on Lone Star's admitted increase in profits and decrease in pit down-time, that Scott's plan was responsible for approximately $60,000,000.00 increased profits during the first year. The evidence was contested and disputed, of course, but it is sufficient, if believed, to support such a conclusion. Lone Star's more significant problem with the $60,000,000.00 figure is that it represents increased *profits* rather than *savings*. It contends that the provisions of its suggestion plan, which speaks of awards based on cash savings rather than profits, require that any award be limited to a percentage of *savings*. Scott correctly points out, however, that several of the plan's descriptions and the eligibility forms used in connection with the plan spoke in terms of suggestions which would "increase production," and there was testimony that increased profits resulting from increased production in Lone Star's situation was the equivalent of cash savings as contemplated by the suggestion plan.

Likewise, there was testimony supporting a conclusion that five percent of the first year's savings produced by a suggestion was a general starting point or "rule of thumb" to guide the suggestion committee in determining the value of an idea and the resulting award. Several awards of that percentage had been made under Lone Star's suggestion plan. Since the suggestion committee in this case refused to make any award to Scott, the jury was authorized to determine the reasonable award under the circumstances, and the evidence relating to five percent of first-year savings was sufficient to justify a finding of that amount.

### FRAUD

In several points, Lone Star challenges the jury findings of fraud and damages suffered by Scott in relying on Lone Star's alleged false representation. We sustain this challenge, and find that there is no evidence that Lone Star made a representation, false when made, that it would pay for his suggestion. We also find that, under the direction of the court's charge, Scott could not recover the value of his suggestion as fraud damages.

For a promise to do an act in the future to be fraudulent, the promisor must have intended at the time the promise was made not to perform it. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432 (Tex. 1986); *Stanfield v. O'Boyle*, 462 S.W.2d 270 (Tex. 1971). There is no evidence in this record that at the time Lone Star promised to pay Scott for his suggestion, as found by the jury, it intended not to honor that promise. Scott argues correctly that a denial by the promisor that he ever made the promise constitutes some evidence of an intention, when made, not to honor it. *Spoljaric v. Percival Tours, Inc.*, supra. But Lone Star has not denied making the statements which we have held constitute an agreement to pay Scott. They have simply contended, and still contend, that the statements do not constitute a legal agreement to pay. That is a perfectly legitimate defense to a contract dispute, and does not constitute any evidence of fraud. This dispute is essentially one over whether Lone Star's suggestion plan, as modified by its *Starlight* announcements and agreements of its officers, constituted a binding contract. It is not a case of fraudulent promises made to induce Scott to develop and implement his idea.

Moreover, the award of $3,016,699.00 for fraudulent representations was unauthorized under the court's charge and the evidence. The charge instructed the jury that:

> [I]n connection with this issue, ... the word "damages" means that sum of money necessary to put a party in the position he would have been in had he not acted in reliance on a false, material representation. You *should not include any amount of money for what the party might have gained or profited had the representation been true*. (Emphasis added.)

The sum of $3,016,699.00 was the value of Scott's suggestion, according to his evidence. It was the "amount of money the party might have gained or profited had

the representation been true," the very thing which the instruction said was not allowed. There is no evidence of any amount of money necessary to put Scott in the position he would have been in had he not submitted and developed his idea. There is no evidence that he would have been better off financially had he not submitted his idea. The idea belonged to Lone Star under the assignment of inventions agreement. The only dispositive question was whether Lone Star agreed to pay Scott for the suggestion.

## EXEMPLARY DAMAGES

■ Lone Star contends that exemplary damages were improperly awarded. We agree that such damages are not recoverable in this case, and we will modify the judgment to delete them.

Exemplary or punitive damages may not be recovered for breach of contract unless there is also proof of a separate and independent tort and a finding of actual damages resulting from that tort. *Texas Oil & Gas Corporation v. Hagen*, 31 Tex.Sup. Ct.J. 140 (Dec. 16, 1987); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986); *Bellefonte Underwriters Insurance Co. v. Brown*, 704 S.W.2d 742 (Tex. 1986). Loss of the benefit of the bargain is not sufficient as a finding for a recovery of damages in such a case. *Jim Walter Homes, Inc. v. Reed*, supra.

As Scott did not prove an independent tort or secure a finding of actual damages resulting from such a tort, a recovery of exemplary damages is not authorized.

## EVIDENTIARY RULINGS

Lone Star attacks the rulings of the trial court in allowing evidence of increased profits resulting from Scott's suggestion, and in excluding from evidence Lone Star's Exhibit 21, which was a summary of awards made under suggestion plans operated by companies throughout the nation.

We have previously noted that evidence of increased profits was proper, since there was evidence that Lone Star's suggestion plan was designed to increase production, and that increased production and profits resulting therefrom were the equivalent of cash savings.

Exhibit 21 purported to show an average of the amounts of money paid for suggestions at companies throughout the country operating suggestion plans. The trial court excluded the exhibit, primarily because it covered a different time period from that involved in this suit. We believe the exclusion was harmless in any event. The average suggestion award in the nation was not the issue here. The issue was what would be reasonable under Lone Star's suggestion plan. Thus, evidence of the suggestion committee's rule of thumb and other awards made under Lone Star's plan would be the most appropriate evidence. While we believe Exhibit 21 was admissible for whatever weight the jury desired to give it, we do not believe its exclusion was calculated to or probably did result in an improper judgment, and it was therefore not reversible error. Tex.R.App. P. 81.

## THE COURT'S CHARGE

Lone Star complains of alleged errors in the court's charge to the jury. Points of Error 32 and 36 attack the use of "increased production" rather than "actual cash savings" in the issues inquiring about the effect of implementing Scott's suggestion. We have already passed on this general issue in other portions of the opinion, and find no error in this aspect of the court's charge.

Numerous points of error are leveled at the submission of the issue inquiring if Lone Star made an agreement with Scott to pay for his suggestion. The basic arguments under these points are that the issue was a legal rather than a factual one, the issue was not a controlling one, and the issue was not limited as to time.

■ Whether or not parties have made a contract is an issue of fact, unless the undisputed documentary or other evidence shows that they intended to enter into a binding agreement. *Scott v. Ingle Bros. Pacific, Inc.*, 489 S.W.2d 554 (Tex. 1972); *Hervey v. Passero*, 648 S.W.2d 344 (Tex.

App.–El Paso), *rev'd on other grounds,* 658 S.W.2d 148 (Tex. 1983); *Henry C. Beck Company v. Arcrete, Inc.,* 515 S.W.2d 712 (Tex.Civ.App.–Dallas 1974, writ dism'd). Once a determination has been made as to what passed between the parties, decisions as to whether their agreement meets the legal requirements of a contract and its interpretation are questions of law. *Hervey v. Passero,* supra; *Enos v. Leediker,* 214 S.W.2d 694 (Tex.Civ.App.–Galveston 1948, no writ). Under our broad submission practice, it was not improper to ask the jury if the parties made an agreement. *Haas Drilling Co. v. First National Bank in Dallas,* 456 S.W.2d 886 (Tex. 1970). And certainly, whether or not Lone Star made a contract to pay for Scott's suggestion was an ultimate issue in the case. Since the question of limitations was covered in another special issue, the failure to limit the issue concerning the agreement to a specific time was not error.

The complaints concerning the special issues on fraud, unjust enrichment, estoppel and bad faith have become immaterial in view of our previous rulings on those subjects.

### PREJUDGMENT INTEREST AND ATTORNEY'S FEES

■ The trial court allowed Scott prejudgment interest on his recovery of actual damages, and also awarded attorney's fees. Lone Star challenges these awards, contending that prejudgment interest was not proper and that attorney's fees should not have been allowed because there was no evidence that Scott presented his demand for payment to Lone Star as required by Tex.Civ.Prac. & Rem.Code Ann. § 38.002 (Vernon 1986).

Our Supreme Court has ruled that prejudgment interest is now recoverable in a breach of contract case, where the contract itself does not fix the amount of damages.

1. Lone Star Steel Company also filed a Motion for Continuance at the same time.

2. The language of the Corrected Order Overruling the Motion to Transfer Venue is as follows:
   On this, the 12th day of January, 1987, came on to be considered the Defendant's

*Perry Roofing Company v. Olcott,* 744 S.W.2d 929 (Tex.1988). The decision applies to all cases now in the judicial process.

■ As for attorney's fees, Lone Star's Admission No. 50 admitted that Scott had repeatedly requested payment for his suggestion. This is sufficient proof of presentment under Section 38.002. *Welch v. Gammage,* 545 S.W.2d 223 (Tex.Civ.App.–Austin 1976, writ ref'd n.r.e.).

### DISPOSITION

For the reasons heretofore stated, the judgment is reformed to eliminate the recovery of exemplary damages. As reformed, the judgment is affirmed.

GRANT, Justice, concurring.

I concur with the majority opinion, except I would also uphold the trial court's ruling that the Motion to Transfer Venue was not timely made.

The docket notice on which this case appeared contained the following statement:
   Both civil and criminal dockets will be called on the first day of each term of court. Civil at 9:00 A.M. and criminal at 10:00 A.M. *All pre-trial motions must be presented on that day.* Civil juries will be selected on the second Monday of the term and criminal juries on the third Monday. (Emphasis added.)

On the day of the docket call, Lone Star Steel Company announced ready for trial. On the day set for the jury trial, Lone Star Steel Company filed a Motion to Transfer Venue.[1] Lone Star Steel Company did not ask leave of the trial court to file the additional pretrial motion, and it did not seek to withdraw its announcement of ready.

As stipulated by Lone Star Steel Company during the trial, the trial court observed in its order [2] that the in-house attorney for

Motion to Transfer Venue and after hearing evidence and the argument of counsel thereon, the Court finds as follows:
   That this case was filed on the 18th day of January, 1983; that since that time several motions for continuance have been granted

Lone Star Steel Company had been aware of the basis for the Motion to Transfer Venue long before the deadline for pretrial motions and long before announcing ready for trial. The court denied the motion on the basis that it was not timely filed, that Lone Star Steel Company was not diligent, and that the motion was filed for the purpose of delaying the trial. Tex.Civ.Prac. & Rem.Code Ann. § 15.063 (Vernon 1986) requires that a motion to transfer a case to another county of proper venue on the basis that an impartial trial cannot be had in the county in which the action is pending shall be "filed and served concurrently with or before the filing of the answer,...."

Tex.R.Civ.P. 258 does not state a specific time for filing a Motion for Change of Venue, but does require that such motions be "duly made." To determine the meaning of "duly made," we must consider Rule 258 in conjunction with other applicable rules. Tex.R.Civ.P. 248 directs that when a jury has been demanded, motions, as far as practicable, shall be heard and determined by the court before the day designated for the trial. Tex.R.Civ.P. 166 permits the trial court to establish a pretrial calendar and to take up at pretrial conference such matters as may aid in the disposition of the case.

We should not diminish the authority granted to the trial court by this rule. If parties are allowed to ignore these rules and the trial court's pretrial orders authorized by the rules, delay and judicial inefficiency is sure to result. Allowing consideration of a Motion to Transfer Venue filed on the day of jury selection is in effect allowing that party an automatic postponement of the trial, so that the opposing party can have an opportunity to file an answer with supporting affidavits and so that evidence can be heard on this pretrial motion.

Only in the case of an abuse of discretion, which has not been shown in the present case, should a judge be reversed on such a ruling. Upon the filing of the Motion to Transfer Venue, Lone Star Steel Company had the burden of showing good cause as to why this motion could not have been filed in accordance with the trial court's pretrial calendar, and this burden has not been met. A trial court can properly refuse to delay a jury trial in order to consider matters presented out of time or order when no good reason is shown to warrant the delayed presentation. *Dyche v. Simmons*, 264 S.W.2d 208 (Tex.Civ. App.–Fort Worth 1954, writ ref'd n.r.e.).

The case of the *City of Abilene v. Downs*, 367 S.W.2d 153 (Tex.1963), is very similar in many respects to the present case on the change of venue issue. I find, however, that in the *Downs* case it was not shown that the trial court directed all pretrial motions to be presented at the docket call, as in the present case. Furthermore, there had not been an announcement of

by the Court, which motions were filed by one or both of the parties; that in December of 1986, a copy of the 76th Judical (sic) District Court docket was mailed to all parties, a copy of which is attached hereto and incorporated herein; the local rule for hte (sic) 76th Judicial District Court which is also contained in the docket sheet provides that all pre-trial motions be presented on the first day of each term; that on the 5th day of January, 1987, at 9:00 A.M., and a jury panel was duly summoned; that Jerry Jones, one of the outside counsel for the defendant, was involved in a protracted trial in the last part of 1986, and started interviewing witnesses the week of January 5, 1987; that at 8:55 A.M. on January 12, 1987, at a time at which the members of the panel were already seated or on their way to the courthouse, the defendant filed its Motion to Transfer Venue; that the events which the defendant alleges created the purported prejudice occurred several weeks prior to January 5, 1987; that William Osborn is an attorney who is employed as in-house counsel for the defendant at its plant in Lone Star, Morris County, Texas; that Mr. Osborn is one of the attorneys in this case and has been involved in its preparation and trial since its inception; that Mr. Osborn has been aware of the events which were the subject of defendant's Motion to Transfer Venue since the time they occurred and should have known, suspicioned, or with diligence could have discovered, that prejudice, if any, existed in Morris County against the defendant; that the defendant was not diligent, its Motion to Transfer Venue was not timely filed, and was filed for the purpose of delaying the trial of this case.

It is, therefore, ORDERED by the Court that the defendant's Motion to Transfer Venue be and it is hereby denied.

ready by the defendant at a docket call a week prior to the trial in the *Downs* case; rather in *Downs*, the defendant filed its motion for change of venue prior to announcing ready for trial.

For the reasons set forth, I would hold that the trial court did not err in ruling that the Motion to Transfer Venue was not timely filed.

BLEIL, Justice, dissenting.

I disagree with the majority's legal conclusion that we are free to apply the harmless error rule to this venue error. Therefore, I dissent.

*Does the harmless error rule apply to this venue error?*

Not according to the law of this state. While I agree with the majority that the harmless error rule has not previously been applied to a denial of a mandatory right to a change of venue, I am not willing to join the majority in deciding for the first time that the harmless error rule applies to appellate review of the trial court's failure to grant a motion for change of venue which is unopposed by affidavit.

Our Supreme Court has spoken on this subject. In *City of Abilene v. Downs*, 367 S.W.2d 153 (Tex.1963), the Court held that when a motion for a change of venue is filed—and not attacked with a supporting affidavit pursuant to Tex.R.Civ.P. 258—the trial court is required to grant the motion. The Court held that: "Rule 258 presupposes, and we think properly, that a change of venue is necessary in the interests of justice if the application therefor stands unchallenged in the manner prescribed." 367 S.W.2d at 156. The facts in *Downs* are strikingly similar to those now before us. These similarities exist: (1) before trial the defendant moved for a change of venue; (2) no affidavit opposing the motion pursuant to Tex.R.Civ.P. 258 was filed; (3) the motion was overruled, apparently without a hearing; and (4) the trial court found that the motion was untimely filed and would cause a delay.

Today's majority concedes that the *Downs* decision makes the trial court's action mandatory when a properly filed motion for change of venue is not opposed. The trial court was required to change venue. It did not. The majority acknowledges that this trial court action, denying the motion for change of venue, was clear error. Without any judicial authority or precedent, the majority first determines that the harmless error rule applies in this setting, then promptly determines the error to be harmless. I would look to *Downs* for more guidance on the subject.

The Court in *Downs* had a perfect opportunity to apply the harmless error rule, but did not. However, the Court did address the meaning of the error, saying: "The trial judge was therefore under the duty of removing the cases pursuant to Petitioner's application for change of venue and this cause must be reversed and remanded for this purpose,...." The *Downs* decision, as precedent binding on this Court, requires that this case be reversed and remanded.

Our Legislature has also spoken quite specifically on whether a venue error requires reversal, in enacting Tex.Civ.Prac. & Rem.Code Ann. § 15.064 (Vernon 1986),[1] which provides:

(a) In all venue hearings, no factual proof concerning the merits of the case shall be required to establish venue. The court shall determine venue questions from the pleadings and affidavits. No interlocutory appeal shall lie from the determination.

(b) On appeal from the trial on the merits, if venue was improper *it shall in no event be harmless error and shall be reversible error.* In determining whether venue was or was not proper, the appellate court shall consider the entire record, including the trial on the merits. (Emphasis added).

Applying this statutory provision, I conclude that once the motion to change venue was not attacked pursuant to Tex.R.Civ.P.

---

1. While the Texas Civil Practice & Remedies Code was enacted in 1985, the historical note in the annotation following Tex.Civ.Prac. & Rem.

Code Ann. § 15.064 (Vernon 1986) dates the prior law to 1863.

258, venue in Morris County became improper. And, pursuant to Tex.Civ.Prac. & Rem.Code § 15.064(b), the trial court's error in no event is harmless; it is reversible error.[2]

Because of my conclusion that the venue error requires a reversal of the trial court's judgment, I would not reach the other issues addressed by the majority of this Court.

---

**2.** Interestingly, this does not appear to represent any change in our law. *See, e.g., City of Abilene v. Downs,* 367 S.W.2d 153 (Tex.1963); *see also, Sneed v. Box,* 166 S.W.2d 951 (Tex.Civ.App.–Fort Worth 1942, no writ); *Wilson v. Ryan,* 163 S.W.2d 448 (Tex.Civ.App.–San Antonio 1942, no writ).