**HACKBERRY CREEK COUNTRY CLUB, INC., Appellant,**

v.

**HACKBERRY CREEK HOME OWNERS ASSOCIATION, Appellee.**

No. 05–05–00204–CV.

Court of Appeals of Texas, Dallas.

Sept. 7, 2006.

Rehearing Overruled Nov. 6, 2006.

Stacy R. Obenhaus, William G. Whitehill, Gardere Wynne Sewell LLP, Dallas, for Appellant.

Joe Chumlea, Bragg Chumlea McQuality & Smithers, Dallas, for Appellee.

Before Justices MORRIS, MOSELEY, and RICHTER.

**OPINION NUNC PRO TUNC**

Opinion by Justice MOSELEY.

The Hackberry Creek Home Owners Association entered into a Membership Agreement with the Hackberry Creek Country Club, Inc., agreeing to pay the Club twenty percent of the amount it collects from members of the Association through "annual assessments." The Association later authorized and levied another assessment—a "special group assessment"—to pay some of the expenses previously paid through the annual assessment, and reduced the amount of the annual assessment by the exact amount of the new assessment. The Association did so in an express, unilateral attempt to reduce its payments to the Club under the Membership Agreement.

When the Club complained, the Association filed suit for declaratory judgment. It sought a declaration that: (1) it had the right to reduce its annual assessment by assigning the recovery of some of its costs to the special group assessment, thereby reducing its payment obligation to the Club; and (2) that its actions in doing so did not violate the Membership Agreement and were binding on the Club. The Club answered and filed a counterclaim for the additional amount it claims it is owed under the Membership Agreement. The trial court denied the Club's motion for summary judgment, and granted summary judgment in favor of the Association.

We conclude that neither party proved its position as a matter of law. Thus, we hold the trial court erred in granting summary judgment in favor of the Association. We reverse the trial court's judgment and remand the case to the trial court for further proceedings.

**I. SUMMARY JUDGMENT STANDARD OF REVIEW**

The standard of review in a traditional summary judgment case is well established. *See* Tex.R. Civ. P. 166a(c); *Black v. Victoria Lloyds Ins. Co.,* 797

S.W.2d 20, 23 (Tex.1990). In reviewing a summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference in favor of the non-movant is allowed, and all doubts are resolved in its favor. *Id.* Once the movant has established a right to summary judgment, the non-movant has the burden to respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979). All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. Tex.R. Civ. P. 166a(c); *Chessher v. Sw. Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam) (summary judgment may not be granted on issues not "expressly presented" to trial court).

In reviewing a no-evidence summary judgment motion, we examine the record in the light most favorable to the non-movant and disregard all contrary evidence and inferences. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750–51 (Tex. 2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002). A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Tex.R. Civ. P. 166a(i); *Wal–Mart Stores, Inc.,* 92 S.W.3d at 506. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch,* 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)).

When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law; neither party can prevail because of the other's failure to discharge its burden. *City of Garland v. Dallas Morning News,* 969 S.W.2d 548, 552 (Tex.App.-Dallas 1998) (en banc), *aff'd,* 22 S.W.3d 351 (Tex.2000). A reviewing court may determine all questions presented; it may affirm the summary judgment entered, reverse and render a judgment for the other party, if appropriate, or reverse and remand if neither party has met its summary judgment burden. *Calhoun v. Killian,* 888 S.W.2d 51, 54 (Tex.App.-Tyler 1994, writ denied).

## II. BACKGROUND

There appears to be little dispute as to the events giving rise to this suit. Looking at the summary judgment record under the appropriate standard of review yields the following information.

### A. Introduction

In 1983, the owner/developer of the property constituting Hackberry Creek Village, a single-family residential development, filed a Declaration of covenants, restrictions, charges, and liens against the property. The Declaration recognized the Association as a nonprofit corporation comprised of all lot owners in Hackberry Creek Village, and gave the Association the power to administer and enforce the Declaration. In addition, the Declaration authorized the Association to assess its members for funds to promote the comfort, health, safety and welfare of the prop-

erties' owners.[1] The Association performs many of the functions of a municipality, such as landscaping, security, and garbage collection, and funds these activities through the assessments. The Declaration was subsequently amended, as described below.

The Club owns and operates a country club adjacent to the Village consisting of a club house, recreational amenities, and a golf course that runs through the Village. In July 1983, the Association and the Club signed the Membership Agreement, which requires the Club to manage and run a "first-class, high quality, private country club." Under the Membership Agreement, all lot owners in the Village may become "Community Members" of the Club without paying any initiation fees; Community Members also receive discounts in Club dues. The Association may terminate the Membership Agreement by a vote of eighty percent of its members; however, the Club has no termination rights. The Membership Agreement specifies that, except for the above termination rights, the agreement is perpetual in duration.

**B. Payment Obligations under the Membership Agreement**

The Membership Agreement also provides for annual payments by the Association to the Club "[i]n recognition of the benefit to the Owners [of lots within the Village] of having a well maintained golf course as an open space amenity within Hackberry Creek Village and in lieu of the payment of any initiation fees by the Com-

munity Members[.]" As executed in 1983, the Membership Agreement provided the Association would pay to the Club, on August 1 of each calendar year, "twenty percent (20%) of all *regular and/or annual*[2] *assessments* levied by the Association under the provisions of the Declaration...." In 1991, the Membership Agreement was amended to provide for payment of "twenty percent (20%) of all *annual assessments* collected by the Association under the provisions of the Declaration...."[3]

**C. Assessments under the Declaration**

*1. Initial Practice*

The 1983 Declaration—the only one in existence when the Membership Agreement was signed in 1983 and amended in 1991—provided for two types of assessments: "special assessments for capital improvements" and "annual assessments or charges."

Special assessments could be levied for "any construction or reconstruction, unexpected repair or replacement of a described improvement including the necessary fixtures and personal property related thereto, or for carrying out other purposes of the Association as stated in its Article[s] of Incorporation." Special assessments were rare; in fact, the only special assessment before 2004 was to fund an attempt (in 1996) to secede from the school district.

Annual assessments were used to fund the Association's operations, with part of the annual assessment proceeds placed in a capital reserve fund to pay for the even-

---

1. A similarly worded statement of purpose was repeated in later amended versions of the Declaration.

2. The phrase "and/or annual" was inserted by an asterisk.

3. The amendment also provided for prompt payment of twenty percent (20%) of any delinquent annual assessments collected after August 1 of each year (excluding interest, attorney's fees, and collection costs). Further, the parties' dispute does not revolve around the change from "assessments levied" to "assessments collected."

tual replacement of streets and other infrastructure. Each year the Association paid the Club twenty percent of the annual assessment, as required by the Membership Agreement. This was accomplished by developing a budget, adding the anticipated payment to the Club, and assessing the total sum among the homeowners based on the appraised value of their respective properties.

The Declaration set the amount of annual assessments at sixty cents per $100 of assessed value. That amount could be increased only by a vote of the Association membership at a meeting called for that purpose; however, the Association's Board of Directors could *reduce* the annual assessment to an amount below sixty cents per $100 assessed value "after consideration of current maintenance costs and *future needs (including, without limitation, reasonable reserves) of the Association....*" Annual assessments were due and payable each year on July 1.

Over the years, the Association's expenses increased significantly, resulting in increased annual assessments and a consequential increase in the Association's payments to the Club. As early as 1995 (and perhaps earlier), the Association discussed ways to reduce its payment to the Club. Among members of the Association, the discussion focused on the "excess payments" to the Club relative to the "no initiation/discounted dues" benefits received by the community members and belief that homeowners who were not

country club members[4] received "nothing in return" for twenty percent of their assessments.

## 2. The 2002 Amendments

In 2002, the Association amended the Declaration.[5] The standard for the annual assessment remained the same, but the amended Declaration provided for two other types of special assessments, including a "special group assessment."[6] There were no standards stated for the new special group assessment, and no such special group assessments were levied or collected in 2002 or 2003.

In early 2003, the Association's Board of Directors formed a committee to review the arrangement with the Club. The Board concluded that during fiscal year 2003, the Association paid the Club $426,000, while community members received only $260,000 in discounts. Consequently, the board calculated that the total payment by the Association to the Club exceeded the net benefit to Association members by approximately $160,000. Some residents met with the Club's parent entity to propose reductions in the amount of Association's annual payment under the Membership Agreement, but no agreement was reached.

## 3. The 2003Assessment Restructuring and the Resulting Lawsuit

In August 2003, the Association's board voted to reduce the annual assessment subject to the twenty percent payment to the Club, thereby reducing its payment to

4. Some, but not all, of the Association's members are *community members* of the Club.

5. The 1983 Declaration provided that it could be amended; it was rewritten in 1996, and then amended in 1998, 2002, 2003, and 2004. Only the 2002 and 2004 Amended Declarations are relevant here.

6. Two other "special assessments" were also added: (1) special individual assessments,

and (2) individual assessments and fines. Special individual assessments were levied against individuals for reimbursement for costs caused by their willful or negligent acts. Individual assessments and fines were levied against individuals for violations of the Association's rules and regulations. They are not at issue here.

the Club by $160,000 for the next fiscal year 2004–05.[7] Specifically, the board: (1) reduced the annual assessment from fifty-four cents per $100 valuation to thirty-three cents per $100 valuation, a reduction of twenty-one cents per $100 valuation; and (2) proposed a "special group assessment" of twenty-one cents per $100 valuation to be used to pay certain expenses. The board sent Association members a "Notice of Annual Meeting" with an information sheet describing this proposal and recommending a favorable vote on the special group assessment. The board stated,

> The portion of our Annual Assessment that would have gone to the Country Club will be put into a special reserve account until any litigation involving this matter is resolved. At that time, it could be used by our Association to reduce the following year's Annual Assessment. *It is expected that similar savings would be experienced in future years.*

(Emphasis added.)

In September 2003, the Club's vice president wrote the Association, indicating the Club was aware of the "Notice of Annual Meeting" and the information regarding the reduced annual assessment. The letter stated that "allocating certain annual assessment expenses to a 'Special Group Assessment' to avoid paying the Club amounts rightfully due . . . [was] an intentional breach of our agreement" and "strongly recommended" that differences be resolved "without attorneys."

On October 9, 2003, the Association sued for declaratory relief, requesting the court to determine: (1) whether it had the right to reduce its annual assessment under the Amended Declaration and recovering some costs under a special group assessment,

thereby reducing its payment obligation to the Club under the Membership Agreement; and (2) whether this reduction was a breach of the Membership Agreement. In November 2003, the Club answered and counterclaimed for breach of contract.

Six days after the Association filed suit, at its October 15, 2003 annual meeting, the resolution approving the special group assessment at the rate of twenty-one cents per $100 valuation passed; the wording of the resolution stated the special group assessment would be used "to pay for village security and/or placed in the street replacement reserve fund. . . ."

### 4. The 2004 Amendments

In June 2004, the Association amended the Declaration again. Relevant to the suit, the 2004 amendments did three things. First, they specified that "Special Assessments . . . shall not be Annual Assessments." Second, they provided that special group assessments could be levied "for purposes such as, but not limited to, capital improvements/replacements and reserve fund contributions[.]" Third, they eliminated the requirement that the Association consider its "current maintenance costs and future needs (including without limitation, reasonable reserves)" before reducing the annual assessment rate. Thus, after the 2004 Amendments, the Declaration contained no standards for determining the annual assessment, and specifically permitted capital improvements, reserves, and other activities to be funded through special group assessments.

Also in June 2004, the Association sent a letter to its members with the assessment invoice, stating that the reduced annual assessment (thirty-three cents per $100 of

---

7. Payment of the 2004–05 annual assessment (as reduced) and the new special group assessment would be due July 1, 2004; the

Association's payment to the Club was due on August 1.

valuation) was to support "the costs of Association services ... [that] include gate house operations, common area landscape maintenance, street lighting, street and wall maintenance, deed restriction enforcement and other operating costs." In addition, the assessment invoice contained a special group assessment at the rate of twenty-one cents per $100 of valuation. According to the letter, "It is expected that the Association will use the Special Group Assessment primarily for infrastructure replacement, capital projects and Capital Reserve Fund contributions."

The fiscal year 2004–05 budget showed an annual assessment in the amount of $1,333,451 and a special assessment in the amount of $848,560, but the budget did not break out expenses specifically for infrastructure replacement, capital projects, or capital reserve fund contributions. The fiscal year 2004–05 budget shows a payment due to the Club in the amount of $266,690, an amount equal to twenty percent of the $1,333,451 annual assessment amount. But that budgeted payment did not include twenty percent of fiscal year 2004–05's special assessment, which was $169,712.

## D. Summary Judgment

██ Subsequently, both parties moved for summary judgment. Citing traditional summary judgment rules, the Association argued it was entitled to summary judgment on its declaratory judgment claim because—under the Declaration as amended—it was entitled to establish a special group assessment to pay some of the expenses previously funded through the annual assessment, thereby allowing it to reduce the amount of its annual assessment (on which the payment to the Club was calculated under the Membership Agreement). The Association also moved for summary judgment on the Club's coun-

terclaim, asserting there was no evidence of any breach of the Membership Agreement.

The Club, citing traditional summary judgment rules, argued it was entitled to summary judgment on the Association's declaratory judgment claims and on the Club's breach of contract counterclaims. It asserted that under the Membership Agreement, the Association's payment obligation was based on the annual assessments received to fund the Association's normal, recurring expenditures and reserves, and the special assessment levied by the membership in 2003 and subsequently addressed in the 2004 amendments to the Declaration was a "sham" instituted solely in an effort to reduce the amount of the annual payment for that fiscal year by $169,712.

On January 13, 2005, the trial court granted the Association's motion for summary judgment and denied the Club's motion. In its final judgment, the trial court awarded attorney's fees to the Association and declared the parties' rights under the Membership Agreement, as amended, pursuant to section 37.001 of the civil practice and remedies code as follows:

> [The Association] has the right under its Declaration, as amended, to establish special assessments, thereby permitting its board of directors to reduce the annual assessment on which its payment obligation to [the Club] under the parties' Membership Agreement, as amended, is calculated. Thus, under the Membership Agreement, as amended, [the Club] is entitled to be paid 20% of all annual assessments collected by [the Association], but not from any of its special assessments. [The Association's] actions in doing so did not and do not constitute a breach of the Membership Agreement, as amended, and are other-

wise binding on the parties under the Membership Agreement, as amended.

This appeal followed.

## III. ISSUES ON APPEAL

The Club argues the trial court erred in granting the Association's motion for summary judgment and in denying the Club's motion because: (1) the trial court incorrectly concluded the Association could unilaterally split its assessment procedures, reduce the annual assessment on which its obligation to pay the Club was calculated, and use a special group assessment to fund the balance of its annual budget with no obligation to pay the Club a percentage of the special group assessment; (2) the trial court's interpretation of the Membership Agreement violated certain rules of construction; (3) the Club satisfied its burden under the no-evidence standard to produce evidence the Association breached the Membership Agreement; and (4) the trial court erred in failing to render judgment for the Club in the amount of $169,712 because it conclusively established that the Association breached the Membership Agreement. The Club argues we should reverse the judgment and, unless remand is appropriate, render judgment in its favor for $169,712 and remand on its claim for attorney's fees and costs.

The Association responds that the Membership Agreement unambiguously permits it to assess its members for its normal operating expenses and infrastructure/capital projects expenses and reserves as it chooses under the provisions of the 2004 Amended Declaration, subject to a good faith requirement to pay the Club pursuant to the annual assessment.

## IV. APPLICABLE LAW

### A. Claims for Relief

"A person interested under a ... written contract[ ] or other writings constitut-ing a contract or whose rights, status, or other legal relations are affected by a ... contract ... may have determined any question of construction or validity arising under the instrument[ ] ... [or] contract ... and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM.CODE ANN. § 37.004 (Vernon 1997). Under the Declaratory Judgments Act, a trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id.* § 37.009.

To prove a claim for breach of contract, a party must establish: (a) a valid contract; (b) the party performed or tendered performance; (c) the opposing party breached the contract; and (d) the party was damaged as a result of that breach. *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.,* 184 S.W.3d 760, 769 (Tex. App.-Dallas 2005, no pet.). A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *Id.* at 769–70. A person may recover attorney's fees, in addition to the amount of a valid claim and costs, if the claim is for breach of a written contract. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997).

### B. Construction of Written Agreements

In construing a written contract, we must ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005) (per curiam); *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank,* 165 S.W.3d

at 312; *Webster*, 128 S.W.3d at 229. "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Webster*, 128 S.W.3d at 229. If we are unable to harmonize the provisions and give effect to all its clauses, the contract is susceptible to more than one reasonable interpretation and is thus ambiguous. *United Protective Servs., Inc. v. W. Village Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex.App.-Dallas 2005, no pet.) (citing *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 347 (Tex.App.-Dallas 2004, pet. denied)).

■ If a contract is susceptible to two constructions, one of which would render it valid and the other invalid, the construction validating it must prevail. *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 867 (Tex.App.-Dallas 2003, pet. denied). Thus, for example, courts will construe a contract in favor of mutuality of obligation. *See Tex. Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex.1970). Additionally, courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive. *Frost Nat'l Bank*, 165 S.W.3d at 311; *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).

■ If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous; then, courts should construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. In doing so, however, courts need not embrace strained rules of interpretation which would avoid ambiguity at all costs. *Reilly*, 727 S.W.2d

at 530. Rather, if a contract is susceptible to more than one reasonable interpretation, it is ambiguous. *Id.*

■ Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances existing at the time the contract was entered into. *Id.* at 529 (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983)). A court may conclude a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993); *see Coker*, 650 S.W.2d at 392–94 (although both parties asserted agreement was unambiguous and moved for summary judgment, supreme court concluded ambiguity existed). If a contract is ambiguous, the court should adopt the construction of the instrument placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary. *Vincent*, 109 S.W.3d at 867.

■ When a contract contains an ambiguity, granting summary judgment based on the contract is improper because the intent of the contracting parties is an issue of fact. *Coker*, 650 S.W.2d at 394; *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1979).

## V. APPLICATION OF LAW TO FACTS

We start our analysis of the summary judgment record as to the intent of the parties by considering the terms of the Membership Agreement as amended in 1991. Only if we find the contract ambiguous do we look at other evidence in the summary judgment record concerning the parties' intent, including evidence of their course of dealing.[8]

8. In its response to the Club's motion for summary judgment, the Association asserted

the trial court may not consider parol evidence as to the parties' actions and intent

In looking at the Membership Agreement, we first note that it does not expressly state whether the Association could take actions it did. It does not provide that the Association can amend the Declaration at will, or cannot amend it at all, or can amend it in some ways but not others.

## A. The Association's Interpretation

Nevertheless, the Association argues the Membership Agreement is unambiguous and supports the trial court's summary judgment. The Association's argument begins with the provisions of the Membership Agreement (as amended in 1991) that: (1) defined the Declaration as one on file when the Membership Agreement was executed and "as now and hereafter from time to time supplemented and amended"; and (2) incorporated the Declaration into the Membership Agreement by reference. The Association asserts that by this language the Club recognized the Association had an absolute right to amend the Declaration; the Club "recognized and accepted this possibility when it signed the Membership Agreement"; and thus any changes it made in the Declaration were, in effect, incorporated into the terms of the Membership Agreement.

Second, the Association refers to the text of the Membership Agreement defining its payment obligation to the Club based on "all annual assessments collected by the Association under the provisions of the Declaration." As that term is contained in the Declaration, the Association asserts the parties thereby indicated an intent to use the phrase in the Membership Agreement in the same way as it was used in the Declaration. By thus deferring to the Declaration—which the parties understood the Association could alter in the future—the Membership Agreement evidences an intent that the Association could alter the assessment structure, and thus change or specify which assessments would be considered when computing the Association's obligation to the Club under the Membership Agreement.

Based on this interpretation of the Membership Agreement, the Association asserts it acted within its rights when it amended the Declaration in 2002 and again in 2004 to create new types of assessments and to change the standards for determining the "annual assessment." Accordingly, it argues it did not breach the Membership Agreement when—in reliance on the amended terms of the Declaration—it established and assessed a "special group assessment" to pay some of the expenses previously paid through the annual assessment, reduced the amount of the annual assessment, and thereby reduced its payments to the Club under the Membership Agreement.

We conclude Association's construction of the Membership Agreement is unreasonable for four reasons.

### 1. Illusory Contract

First and foremost, the Association's construction would allow it, acting unilaterally, to reduce or even eliminate its pay-

---

because the Club did not plead ambiguity. In its brief, the Association characterizes its actions below as objecting to any assertion that the Membership Agreement was ambiguous on the grounds of the "absence of pleadings to support this defense." It refers the Court to this argument in its brief, and states the Club has not raised ambiguity as an issue in this appeal.

Given that ambiguity is a question of law, see Webster, 128 S.W.3d at 229, which the court may determine in the absence of a pleading by either party, see Coker, 650 S.W.2d at 392–94, we reject any contention that this Court cannot consider whether the Membership Agreement is ambiguous.

ments to the Club. Thus, it would render the Association's promise to pay illusory, and destroy the mutuality of the parties' obligations under the Membership Agreement. *See Webster*, 128 S.W.3d at 243 (Smith, J., dissenting) (noting at-will employment contract illusory when employee's rate of compensation and all other personnel policies subject to unilateral change by employer). The Association disagrees, stating in its brief as follows:

> Where one party to a contract controls the decision on the extent of its performance (e.g., "requirements" and "output" contracts), or on the adequacy or acceptability of another's performance, courts have traditionally imposed a good-faith requirement in measuring whether these promises are mutual or illusory. For example, contracts sometimes provide that one's performance shall be to the satisfaction of the other party. *Just like the situation presented in this appeal, performance of the promise in these cases is potentially subject to the whim or caprice of one party to the contract.* The general rule in such cases is that the judgment of the party regarding the adequacy of performance will be upheld if its is made in good faith.

(Emphasis added, citations omitted.) This is the Association's only contention as to why its interpretation would not render the Membership Agreement illusory.

The Association's brief cites two cases in support of its contention: *Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 608 (Tex.1998), and *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 88–89 (Tex.1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). Both of these cases involve output contracts governed under the Texas Business and Commerce Code. As the Membership Agreement is not an output or require-

ments contract and is not governed by the Business and Commerce Code, we conclude neither case is on point.

The Association also filed a letter brief citing six more cases—not governed by the Texas Business and Commerce Code—it contends support its position that it is subject to a "good faith" obligation when it decides how much (or whether) to pay the Club under the Membership Agreement. Bolstered by these cases, it asserts its construction does not render the Membership Agreement an illusory contract. We discuss each of these cases below. However, we conclude all of them are distinguishable from the facts here. In all six cases, the parties' agreements provided—expressly and unambiguously—that the governing decision concerning a term of the contract—adequacy of past performance, feasibility of future performance, or amount of payment—lay solely in the hands of one party. Thus, in each case it could be fairly stated that the parties expressly agreed to that allocation of discretion.

In *Golden State Mutual Life Insurance Co. v. Kelley*, 380 S.W.2d 139, 140 (Tex. Civ.App.-Houston [1st Dist.] 1964, writ ref'd n.r.e.), an insurance agent's contract with his insurance company stated it could be terminated "if, in the opinion of the Company, the production of the [agent] is insufficient." One of the reasons given for the agent's eventual termination was his "insufficient" production. Despite a jury finding that the agent had breached the contract, the trial court entered judgment for the agent. The court of appeals reversed and rendered judgment. In doing so, the court stated that the reasonableness of the company's determination of insufficient production was not an issue. Further,

> The agreement of the parties left that matter to be determined by the compa-

ny.... The company must, in fact, have been of the opinion that the production was insufficient, or a cancellation on that ground would be tainted with fraud. The determination must have been made in good faith.

*Id.* at 141.

In *Young v. Warren,* 444 S.W.2d 777, 778 (Tex.Civ.App.-Beaumont 1969, writ ref'd n.r.e.), a cotenant in land sent another cotenant a signed deed with a letter stating "just send me a check for whatever amount you think is a fair price for my half interest." When the seller deemed the amount received less than fair, he sued and won a higher amount from the trial court, based on evidence of the land's fair market value. Despite the defendant's argument that "fair market value" evidence was irrelevant and that the issue the jury should have determined was what the defendant thought was a fair price, the court of appeals affirmed, stating that when one party's promise is conditioned upon the "satisfactory performance" of another party, the promise " 'is generally considered as requiring a performance which shall be satisfactory to him in the exercise of an honest judgment....' " *Id.* at 780 (quoting *Atomic Fuel Extraction Corp. v. Estate of Slick,* 386 S.W.2d 180, 185 (Tex.Civ.App.-San Antonio 1964), *writ ref'd n.r.e.,* 403 S.W.2d 784 (Tex.1965) (per curiam), which in turn quoted WILLISTON ON CONTRACTS § 675A (3d ed.)). Further, the decision concerning satisfactory performance "must be in good faith." *Id.* (citing *Golden State Mut. Life Ins. Co.,* 380 S.W.2d at 141).

In *Kree Institute of Electrolysis, Inc., v. Fageros,* 478 S.W.2d 569, 570 (Tex.Civ. App.-Waco 1972, no writ), the express terms of an employment contract provided it was terminable if the employee's services "shall prove to be unsatisfactory or detrimental to the business" of the employer. The court of appeals noted as a "well-established rule of law" the unremarkable statement that at a contract providing for termination at the option of one or either party was generally enforceable. *Id.* at 572. It went on to state that, because the contract at issue provided the employer would be the sole judge of the employee's performance, the "reasonableness" of the employer's action in terminating the employee was not an issue. *Id.* The court added,

> However, the determination, altho [sic] it may have been unreasonable, must have been in good faith. In other words, the employer must in fact have been of the opinion that the employee's performance was unsatisfactory and detrimental to the business of the employer.

*Id.* (citing *Golden State Mut. Life Ins. Co.,* 380 S.W.2d at 141, and the cases cited therein).

The fourth case cited in the Association's letter brief, *Aycock v. Vantage Management Co.,* 554 S.W.2d 235, 236 (Tex. App.-Dallas 1977, writ ref'd. n.r.e.), involved a real estate lease with a one-time option to renew "on the then prevailing rental rates for properties of equivalent quality, size, utility and location, with the length of the Lease term and credit standing of the Lessee to be taken in account." The lease also provided the lessor would notify the lessee in writing of its intent to renew and of the proposed rental rate. This Court held the option was not void for uncertainty based on the amount of the renewal rent. We stated a contract may be enforced "although the performance of one of the parties is to be measured by a standard of reasonableness, *if the contract expressly so provides,* and that this principle applies to the matter of monetary compensation when the parties have agreed to be bound by that standard." *Id.* at 237

(citing CORBIN ON CONTRACTS § 97 (1963)) (emphasis added).

In *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 151 (Tex.App.-Texarkana 1988, writ denied), Lone Star had an employee "suggestion plan" under which "[c]ash awards [would] be paid for all suggestions adopted." There was evidence the amount of any award would be based on a percentage of the savings resulting during the first year the suggested change was in operation, that by submitting a suggestion, an employee waived any other rights to compensation for his or her idea, and that all of Lone Star's decisions with respect to the suggestion plan, including "the making of awards" was "final and binding on all parties." *Id.* When Lone Star refused to pay employee Scott, he sued for breach of contract and prevailed. The court of appeals affirmed, despite Lone Star's argument that its promise was too indefinite to constitute a contract. The court stated,

> [A]lthough the determination of what is reasonable was placed in the discretion of Lone Star's suggestion committee, the committee cannot void the contract by refusing to exercise that discretion. If the committee refuses to set the amount, it is deemed to have waived that right, and to have left the matter to determination by the court.

*Id.* at 152–53.

In the sixth case cited by the Association, *Young v. Neatherlin*, 102 S.W.3d 415, 420 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (*Neatherlin*), the seller/mover of manufactured housing [9] (*Neatherlin*) expressly reserved the right to "deem this contract null and void, if in his opinion there are obstacles and/or circumstances that would make it unfeasible to deliver the above referenced houses." When Neatherlin sued for breach of contract, the buyer (Young) argued that the contract failed for lack of mutuality. The court held Young had waived this complaint by not objecting to the submission of the breach of contract issue. *Id.* at 419. However, in dicta the court went on to state, "When, as here, performance is conditioned on one party's judgment or determination, courts imply a requirement that such judgment is exercised in good faith." *Id.* at 420 (citing *Golden State Mut. Life. Ins. Co.*, 380 S.W.2d at 141).

Unlike the six cases cited in the Association's letter brief, here the Association's purported discretion to decide whether and how much to pay the Club would arise—not from an express declaration to that effect—but by implication based on a reading of the two clauses in the Membership Agreement that define the Declaration and incorporate it into the Membership Agreement by reference. Individually or when read together, these clauses on their face: (1) do not pertain directly to the issue of the amount owed by the Association to the Club under the Membership Agreement; and (2) do not expressly identify the amount of the Association's payment as an issue subject to one party's determination.

■ As noted previously, courts need not embrace strained rules of interpretation in order to avoid ambiguity at all costs. *See Reilly*, 727 S.W.2d at 530. The text of the Membership Agreement yields no clear indication that the parties understood they were leaving the amount of the payments to the Club to the sole and absolute discretion of the Association, with no standards for determining that amount,

---

9. Thus, this case also involved a sale of goods subject to the Texas Business and Commerce Code.

save the Association's "good faith." Under the circumstances of this case, we decline to construe these two clauses in such a way as to render—by implication—the amount payable to the Club "potentially subject to the whim or caprice" of the Association, and then save the contract from the illusory effects of that construction by importing a "good faith" or "reasonableness" requirement with respect to the Association's determination of the standards for annual assessments under the Declaration and the Membership Agreement.

### 2. Unreasonable, Inequitable, and Oppressive

Second, the Association's proposed imposition of a "good faith" or "reasonableness" requirement as a part of its proposed construction would render the Membership Agreement unreasonable, inequitable, and oppressive. *See Frost Nat'l Bank*, 165 S.W.3d at 311; *Reilly*, 727 S.W.2d at 530. The six cases cited in the Association's letter brief, discussed above, illustrate why.

In each case, the matter on which the contract allowed one party to dictate its conclusion resulted in a "one-time" effect on the other party. In *Golden State Mutual Life Insurance Co.; Kree Institute of Electrolysis, Inc.*, and *Neatherlin*, the decisions resulted in the contracts' terminations. In *Young, Aycock*, and *Lone Star Steel Co.*, the decisions involved the pricing for one-time transactions—respectively, the sale of an undivided interest in land, exercise of a one-time lease extension, and the use of an employee's money-saving suggestion. Thus, whatever may be said about the express allocation of such discretion to one party to a transaction, when that party's decision was made the relationship between the parties was complete—the "deal was over." Not so here.

Construing the Membership Agreement to grant the Association the right to decide whether and how much to pay the Club bestows on the Association much more than the right to determine the terms of a one-time transaction between the parties. Here, the Club is obliged—in perpetuity (at least as far as its ability to terminate is concerned)—to operate "a first-class, high quality, private country club" including a golf facility. It must do so regardless of its costs of performing, and is prohibited from realizing any benefits from the increase in its property values. Its most significant protection from the financial risks resulting from its obligation under the Membership Agreement is the Association's payment obligation, which the Club contends is pegged to some degree to the Association's costs. Even if we were to conclude that the Association is subject to a "good faith" obligation when it decides how much (or whether) to pay the Club, and thus that its construction does not render the Membership Agreement an illusory contract, the contract as construed remains unreasonable, inequitable, and oppressive. *See Frost Nat'l Bank*, 165 S.W.3d at 311; *Reilly*, 727 S.W.2d at 530.

The Association disputes this contention, asserting that the summary judgment evidence showed it merely reduced its payments to the Club to an amount "commensurate with the actual economic benefits it provides" to the Association's members through discounted memberships and dues. The Membership Agreement contains nothing that would support linking the Club's payments to the amount of discounts on initiation fees and dues it gives to Association members. Moreover, the fact that the Association's payment to the Club for fiscal year 2004–05 was for an amount roughly equal to these benefits does not save its construction of the Membership Agreement from being unreasonable, inequitable, and oppressive. That

construction would not compensate the Club for its inability to realize any benefits from the increased value of its property. Nor would it compensate the Club for the positive impact its existence and operation have on the Association members' property values—an effect recognized by the parties in the recitals in the Membership Agreement. Bearing in mind that our primary goal is to ascertain the intent of the parties when they entered into the agreement, we conclude such a construction is unreasonable, inequitable, and oppressive.

### 3. Utilitarian Construction

Third, the Association's construction of the Membership Agreement is inconsistent with the principle that in seeking to determine the intent of the parties, we construe contracts from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *See Frost Nat'l Bank,* 165 S.W.3d at 311; *Reilly,* 727 S.W.2d at 530. Here, the Club and the Association entered into a long-term arrangement. In return for payments from the Association, the Club was obligated to provide "a first-class, high quality, private country club" including a golf facility and to make memberships in the Club available to members of the Association on a discounted basis. As noted above, the Association's members would benefit from such an amenity through the opportunity to receive discounted Club memberships and dues as well as increased property values. Also as noted, the Club would not directly benefit from any increase in property values, as its obligation to maintain its property as a country club and golf course extended in perpetuity. Moreover, both parties could anticipate the costs for providing those amenities would vary over the years—as would the costs of the Association for providing services to the homeowners.

To compensate the Club, the Association agreed to pay a portion—twenty percent—of the Association's annual assessments under the Declaration. As a result, the Club was assured of a payment stream that would fluctuate in tandem with the amounts needed to maintain properties in the area, and would compensate it indirectly for the increased value of its property—an increase it could not realize because of its perpetual obligation to utilize its property as a private country club and golf facility. The Association's construction of the Membership Agreement would sever this link, undercutting the parties' negotiated contractual arrangements and threatening the Club's economic ability to continue to operate the facility that is the purpose of the Membership Agreement.

### 4. Membership Agreement's Terms Conflict

Fourth and finally, the Association's proposed construction of the Membership Agreement would leave a conflict among its terms. The Association reads the "as now and hereafter from time to time supplemented and amended" definition of "the Declaration," in tandem with the clause incorporating the Declaration into the Membership Agreement, as giving it the unilateral power to alter its payment obligation under the Membership Agreement by amending the Declaration. Under this construction, these two clauses conflict with a provision in the Membership Agreement stating that the Membership Agreement constitutes the entire agreement between the parties, as well as two provisions stating the Membership Agreement may not be modified or amended except by written instrument executed by the Association and the Club. As a result, the Association's construction does not avoid an ambiguity in the Membership Agreement. *See United Protective Servs., Inc.,* 180 S.W.3d at 432.

### 5. Conclusion

For the reasons set forth above, we conclude the Association's construction of the Membership Agreement is not reasonable. As the trial court's summary judgment in favor of the Association was predicated on this construction, we conclude the trial court erred in entering judgment in favor of the Association on its declaratory judgment action and on the Club's counterclaim. *See Coker*, 650 S.W.2d at 394, *Harris*, 593 S.W.2d at 306. As a result, we further conclude the award of attorney's fees pursuant to section 37.009 of the civil practice and remedies code was in error. We sustain the Club's issues attacking the summary judgment entered in favor of the Association.

### B. The Club's Interpretation

We now turn to the Club's interpretation of the Membership Agreement. Not surprisingly, the Club also contends the Membership Agreement is unambiguous. However, it contends the Membership Agreement not only defeats the Association's right to summary judgment, but supports its own request for summary judgment.

The Club's interpretation starts with the provision in the Membership Agreement entitling it to twenty percent of "all annual assessments collected by the Association under the provisions of the Declaration." The Club argues this provision—and the other provisions of the Membership Agreement—neither defined "annual assessment" nor adopted any definition of that term set forth in the Declaration. Thus, the Club argues the term should be interpreted according to its ordinary meaning.

Using that meaning, the Club contends "all annual assessments collected by the Association under the provisions of the Declaration" means all regularly recurring, yearly assessments whether they are labeled by the Declaration as an "annual" or a "special" assessment. At oral argument, the Club clarified that its construction would include in the basis for the payments all amounts assessed on an annual basis to meet annual budget needs. Thus, the Club argued that, keeping in mind that the Association was a non-profit entity, the Membership Agreement as a practical matter entitled it to an amount equal to twenty percent of the Association's annual budget. It later clarified its statement to exclude assessments made to pay for unanticipated expenditures; however, depending on the circumstances, it argued a "special assessment" made every year could in fact be an "annual assessment" that must be included when computing the amount of the Association's payment.

Relying on its construction of the Membership Agreement, the Club argues the evidence showed the "special group assessment" levied in fiscal year 2004–05 was a sham to avoid payment of the full amount the Club was entitled to under the Declaration; it asserts the special group assessment was, in substance, part of the Association's annual assessment, regardless of its form. Thus, according to the Club, the summary judgment evidence showed as a matter of law that the Association breached the Membership Agreement by, first, approving a special assessment to pay expenses traditionally funded through annual assessments for the purpose of reducing its debt to the Club, and, second, tendering an annual payment based on the reduced assessment.

We are also unpersuaded by the Club's construction of the Membership Agreement. We are unprepared to state that the Membership Agreement's reference to "all annual assessments collected by the Association under the provisions of the Declaration" proves, as a matter of law, that the Membership Agreement did *not*

adopt the meaning of the phrase "annual assessments" used in the Declaration. To the contrary, this phrase specifically refers to annual assessments and identifies them as those collected "under the provisions of the Declaration."

Further, as the Association points out, other terms of the Membership Agreement support the interpretation that the parties intended "annual assessments" to have the same meaning under both the Membership Agreement and the Declaration. Specifically, it points to the provision in the Declaration making the annual assessments due on July 1, and the provision in the Membership Agreement making the Association's payment to the Club due on August 1.

Thus, we conclude a key portion of the Club's argument—that the term "annual assessment" is an undefined term to be construed according to its ordinary meaning—is contrary to the terms of the Membership Agreement and violates the principles of contract construction. *See Frost Nat'l Bank*, 165 S.W.3d at 312; *Webster*, 128 S.W.3d at 229. We reject the Club's interpretation of the agreement. As this was the basis for the Club's motion for summary judgment, we conclude the trial court did not err in denying that motion.

Tex.R. Civ. P. 166a(c); *see Chessher*, 658 S.W.2d at 564. We overrule the Club's issues asserting the contrary.

■ The Club asserts its interpretation of the Membership Agreement is supported by the evidence of the parties' actions from 1983 until the assessment in fiscal year 2004–05.[10] If the agreement of the parties is ambiguous, courts will look at evidence of how the parties construed the agreement in an effort to resolve that ambiguity. *See Vincent*, 109 S.W.3d at 867. However, we have not determined as a matter of law that the Membership Agreement is or is not ambiguous. Rather, in the context of an appeal from the trial court's determination of cross-motions for summary judgment, we conclude that neither party met its respective burden of asserting a theory on which it might prevail and then proving the elements of that theory as a matter of law. *See Calhoun*, 888 S.W.2d at 54.

Assuming for purposes of argument that the Membership Agreement is ambiguous, however, the evidence to which the Club alludes does not prove that the parties used the term "annual assessment" in the Membership Agreement according to its ordinary meaning. Further, although the

---

**10.** The Club asserts that during that time the Association paid all normal, recurring expenses (e.g., operating expenses, capital fund contributions, etc.) through annual assessments—never through a special assessment. Further, in the one situation where the Association levied a special assessment (to fund efforts to secede from the school district in 1996), the Club did not claim that any part of the special assessment proceeds were due it under the Membership Agreement. Lastly, when the Association sought to change the basis for its payments to the Club in 1991 (by changing the payment from twenty percent of "all regular and/or annual assessments levied" to twenty percent of "all annual assessments collected"), it did so by a written amendment of the Membership Agreement executed by it and the Association. Thus, the Club asserts the parties' experiences under the Membership Agreement are consistent with its proposed construction, and constitute evidence that the parties intended that: (1) the Association would use annual assessments to raise normal operating expenses, and the Club's payment would be based on the amount of such assessments collected; (2) the Association would use special assessments for unusual, special circumstances, and not to pay normal operating expenses, and the Club's payments would not reflect such special assessments; and (3) the Association could not unilaterally change its obligations under the Membership Agreement by amending the Declaration.

above evidence is probative as to the parties' intent concerning the Association's ability to amend the Declaration, it does not resolve that issue as a matter of law.

## VI. CONCLUSION

Both parties moved for summary judgment, and each party bore the burden of establishing its entitlement to judgment as a matter of law; neither party may prevail because of the other's failure to discharge its burden. *See City of Garland*, 969 S.W.2d at 552. We conclude that neither party met its summary judgment burden. *See Calhoun*, 888 S.W.2d at 54. Accordingly, we reverse the trial court's final judgment and remand the case to the trial court for further proceedings.