**Affirmed; Opinion Filed June 23, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00258-CV

### SHIELDS LIMITED PARTNERSHIP, Appellant
### V.
### BOO NATHANIEL BRADBERRY AND 40/40 ENTERPRISES, Appellees

**On Appeal from the County Court at Law No. 5**
**Dallas County, Texas**
**Trial Court Cause No. CC-14-00541-E**

## MEMORANDUM OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Myers

This case involves the right to possession of the property containing the San Francisco Rose restaurant in Dallas, Texas. Shields Limited Partnership ("Shields") appeals the trial court's judgment awarding possession of the premises to Boo Nathaniel Bradberry and 40/40 Enterprises, Inc. in this suit for forcible detainer. Shields brings one issue on appeal contending the trial court erred by awarding possession of the property to appellees. We affirm the trial court's judgment.

## BACKGROUND

In 1997, Bernard E. Shields owned the property containing the San Francisco Rose restaurant in Dallas, Texas. On March 19, Bernard Shields leased it to Mohsen Heidari for a ten-year term from June 1, 1997 to May 31, 2007. The lease provided that the tenant had the option to extend the term for an additional five-year period at the rate of $3,000 per month if the

tenant had "fulfilled all of the terms and conditions of the initial lease period." To exercise the option, the tenant was to notify the landlord's agent at least ninety days before the expiration of the initial lease term. The lease provided for holdover rent after the expiration of the lease's term of $3,000 per month. The lease required all rent to be paid on or before the first day of the month and delivered to landlord's agent, Robert Lindsley, a real estate broker. The lease provided there was an event of default if the rent was not paid by the tenth day of the month. If the rent was paid late, the lease permitted the landlord to impose a late charge.

At some point after the execution of the lease, Bernard Shields transferred the property to Shields Limited Partnership. In late 2004 or early 2005, Tom Shields, Bernard Shields's son, took over as general manager of the Shields partnership.

On June 1, 2005, Heidari subleased the property to Bradberry, and Bradberry sub-subleased the property to his company, 40/40 Enterprises, Inc. Lindsley, as agent for Shields, signed the sublease consenting to the sublease. The sublease provided that it was subordinate to the lease and subject to all the terms and conditions of the lease. In the sublease, Bradberry assumed all the obligations of the tenant under the lease. The sublease stated its termination date was the same as the termination date of the lease. The sublease also provided that if the terms of the lease were fulfilled, then Bradberry would sign a new lease with Shields and would become the tenant (as opposed to subtenant) effective June 1, 2007.

The controversy in this case largely concerns an alleged amendment to the lease in April 2005, entered into while Bradberry was negotiating for the sublease. That provision stated that if "Subtenant," i.e., Bradberry, had fulfilled all of the terms and conditions of the lease, he would "have the option as Tenant to extend the lease for an additional 5 years from June 1, 2012 through May 3, 2017," with the changes that (1) the rent would be adjusted annually to reflect changes in the Consumer Price Index (CPI), and (2) that Bradberry would have to pay the pro

rata share of the property taxes "when billed by Principal Realtor or Landlord." The amendment required Bradberry to exercise the option at least ninety days before the lease ended on May 31, 2012. The amendment also contained provisions for extending the lease from 2017 to 2022 and from 2022 to 2027. The amendment was signed by Heidari, Bradberry, and Lindsley. A space for Tom Shields to sign as "Landlord" was not signed.

On February 22, 2007, Lindsley sent Heidari a letter reminding Heidari of his right to extend the lease through May 31, 2012. Heidari timely signed a statement at the bottom of the letter stating, "I want to exercise my option as outlined above." On September 23, 2011, which was more than ninety days before May 31, 2012, Bradberry sent Lindsley a letter, stating, "As you know, per our conversations, we will be exercising our option to stay at the Rose . . . ."

Bradberry testified that through 2011, he dealt only with Lindsley on behalf of the landlord, Shields, and that he never even met Tom Shields until 2012. All of Bradberry's rent checks through the end of 2011 were made payable to Lindsley's company. In January 2012, a new company, Lagniappe LLC and Scott Covington, took over management of the property from Lindsley's company. Bradberry was directed to make the rent checks payable to Shields beginning January 2012. Lindsley died in July 2012.

Although the lease stated that all rent payments were due on the first of the month, Bradberry testified that Lindsley told him to pay the rent by the twentieth day of each month with a five-day grace period. However, Bradberry's rent payments were occasionally made after the twenty-fifth day of the month. The rent for May 2012 was not paid until June 13, 2012, and the November 2012 rent was paid on December 4, 2012. When the December 2012 rent was not paid by December 18, Tom Shields sent Bradberry a letter of default via e-mail telling Bradberry that if the rent was not paid within five days, further action would be taken. Shields also assessed late fees of $500 each for November and December 2012.

The same day as the letter of default, Bradberry responded with an e-mail to Tom Shields stating the check was in the mail and would be delivered the next day. Also on December 18, 2012, Bradberry sent Tom Shields a letter stating that on May 31, 2012, he began the first of three five-year extensions of the lease. In the letter, Bradberry described that having the lease extensions through 2027 was a significant reason for his purchase of the restaurant because of the extensive restoration and renovations necessary for the property. Bradberry also stated the extensions were necessary for the restaurant to obtain its liquor license. Bradberry stated in the letter that he had spent over $250,000 on the building, and that he would not have spent that money if he did not think he could own the business for many years.

On October 16, 2013, Covington sent Bradberry a proposed new lease, which increased the rent from $3,000 per month to $9,700.83 per month. Bradberry rejected the proposed lease.

On October 30, 2013, Shields's lawyer sent Bradberry notice of termination of the lease. The notice stated that the lease had expired on May 31, 2012, and that the landlord had permitted Bradberry to occupy the premises since then on a month-to-month basis. The letter also stated that if the 2005 amendment to the lease was valid, then Bradberry had failed to pay any increased rent and his share of the property taxes, which constituted a default under the lease. The notice of termination required Bradberry to vacate the premises by December 1, 2013.

When Bradberry did not vacate the property, Shields filed suit for eviction in the justice court. The justice court ruled for Bradberry, and Shields appealed to the county court at law. After a trial before the court, the trial court awarded possession of the premises to Bradberry and 40/40 and awarded them attorney's fees.

**STANDARD OF REVIEW**

This case was tried before the court. The parties did not request findings of fact and conclusions of law, and the trial court did not make findings of fact and conclusions of law.

–4–

When no findings of fact and conclusions of law were requested or filed, it is implied that the trial court made all findings necessary to support its judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.). The judgment will be upheld on any legal theory that finds support in the evidence. *Niskar*, 136 S.W.3d at 754.

In this case, Shields contends it conclusively established that Bradberry and 40/40 had no right to possession of the premises. Shields contention is a challenge to the legal sufficiency of the evidence to the trial court's implied findings. *See Estate of Finney*, 424 S.W.3d 608, 623 (Tex. App.—Dallas 2013, no pet.) ("An appellant attacking the legal sufficiency of an adverse finding on an issue on which it has the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue."). When addressing a legal sufficiency challenge, we view the evidence in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

When construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam); *J.M. Davidson*, 128 S.W.3d at 229. When the provisions of a contract appear to conflict, we will attempt to harmonize the provisions and assume the parties intended every

–5–

provision to have some effect. *See United Protective Servs., Inc. v. West Village Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.—Dallas 2005, no pet.). In doing so, however, we need not embrace strained rules of interpretation in order to avoid ambiguity at all costs. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). If we are unable to harmonize the provisions and give effect to all its clauses, the contract is susceptible to more than one reasonable interpretation and is thus ambiguous. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2006, pet. denied).

## FORCIBLE DETAINER

A forcible detainer action is a procedure to determine the right to immediate possession of real property where there was no unlawful entry. TEX. PROP. CODE ANN. § 24.002(a)(2) (West 2014); TEX. R. CIV. P. 510.1;[1] *Rice v. Pinney*, 51 S.W.3d 705, 709 (Tex. App.—Dallas 2001, no pet.). It is intended to be a speedy, simple, and inexpensive means to obtain possession without resort to an action on the title. *Scott v. Hewitt*, 90 S.W.2d 816, 818–19 (Tex. 1936); *Rice*, 51 S.W.3d at 709. The trial court must adjudicate the right to actual possession of the property. TEX. R. CIV. P. 510.3(e).

The parties disagree about whether the lease term was month-to-month following the expiration of Heidari's lease in 2012 or whether the lease was extended to 2017 under the extension provision in the 2005 amendment to the lease. If the lease expired in 2012, then Shields was entitled to recover possession of the property; but if the term of the lease was extended by the 2005 amendment to 2017, then Bradberry was entitled to keep possession of the property if he complied with the terms of the lease as amended.

---

[1] Although rule of civil procedure 510 is titled "Eviction Cases," it states that it applies to suits "to recover possession of real property under Chapter 24, of the Texas Property Code." Chapter 24 of the property states, "Eviction suits include forcible entry and detainer and forcible detainer suits." *See* TEX. PROP. CODE ANN. § 24.004(a) (West 2014); TEX. R. CIV. P. 510.1.

–6–

Shields first asserts, "If the unsigned amendment is unenforceable, which it should be, the Lease terminated on May 31, 20012 [sic]." Shields presents no argument or authority supporting this assertion. The rules of appellate procedure require that a party present argument and cite authority in support of the contentions made in the brief. TEX. R. APP. P. 38.1(i). Because Shields has presented no argument beyond the conclusion that the amendment was unenforceable and cited no authority in support of it, we conclude Shields has not properly briefed this assertion. *See Reeder v. Curry*, 426 S.W.3d 352, 357 (Tex. App.—Dallas 2014, no pet.).

Shields also argues that if the amendment is enforceable, then the trial court should have determined that the extension to 2017 never took effect because Bradberry was behind on the rent at the end of the term of the lease, May 31, 2012. Section 17.10 of the amended lease stated, "If Subtenant has fulfilled all of the terms and conditions of the lease and option set forth in 17.03, he shall have the option as Tenant to extend the lease for an additional 5 years from June 1, 2012, through May 31, 2017 . . . ." Section 17.03 stated,

> If Tenant has fulfilled all of the terms and conditions of the initial lease period, he shall have the option to extend the lease for an additional 5-year period at the rate of $3,000/month. Tenant will notify Landlord's Agent in writing of his intention to exercise this option no later than ninety (90) days prior to the expiration of the initial lease period.

The trial court could conclude that Bradberry gave timely notice by delivering a letter to Lindsley on September 23, 2011, stating, "we will be exercising our option to stay at the Rose." However, it is undisputed that Bradberry had not paid the rent for May 2012 by May 31, 2012. Bradberry testified that he was not current on the rent on May 31, 2012. Bradberry also testified he sent Tom Shields an e-mail on June 7, 2012, stating he would pay the rent for May 2012 by June 13, 2012. Shields argues that the extension from 2012 to 2017 never went into effect because Bradberry, by failing to pay the May 2012 rent before May 31, 2012, had not "fulfilled all of the terms and conditions of the lease." Bradberry responds that the trial court could have

determined that Shields waived the late payment of the May 2012 rent and agreed to let the extension take effect.

Waiver is the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (quoting *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)).

> Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right.

*Id.* at 156–57 (citations omitted).

Shields argues there was no waiver because its conduct in accepting the monthly rent payments after May 2012 of $3,000 per month was consistent with its assertion that the lease had expired and Bradberry had become a month-to-month tenant with rent of $3,000 per month. However, in this case, it is Shields's conduct by accepting the May 2012 rent that is relevant, not its later conduct. The trial court could have found that Shields's acceptance of the late May rent payment without protest constituted acceptance of the payment as fulfilling the obligations under the lease. The trial court could have determined that if Shields had meant to accept the late payment but also object to the lack of compliance with the lease's requirement of timely payment, Shields would have had to do something, such as impose late fees or declare the lease in default, indicating that the late payment did not constitute compliance with the lease. The trial court could have found that Shields's conduct of accepting the late May 2012 rent payment without protest was not consistent with an assertion that Bradberry had failed to fulfill the obligations of the lease. Because Bradberry had previously given Shields timely notice of his intent to exercise the extension option, the extension took effect.

Shields also argues that, even if the extension took effect, Bradberry was in default because he failed to pay the amount of rent due under the extension provision. The 2005 amendment to the lease stated that the rent under the extension provision would be $3000 per month adjusted by changes in the CPI since 2007. The monthly rent for each year from June to May was to be calculated annually by multiplying $3,000 by the CPI for April of that year, dividing that number by the CPI for April 2007, and rounding that number to the nearest five-dollar increment. Shields's attorney asked the trial court to take judicial notice that the CPI for April 2012 was 230.085 and that the CPI for April 2007 was 206.686. Applying those numbers to the rent formula in the 2005 amendment shows the rent for June 2012 through May 2013 was $3,340 per month. It was undisputed that Bradberry continued to pay rent of only $3,000 per month after May 31, 2012. Therefore, Bradberry failed to pay the full amount of rent due under the lease from June 1, 2012, through May 31, 2013. Shields accepted the rent payments of $3000 per month without protest as to the amount. The amount of the rent would have been adjusted again for rent due June 1, 2013, through May 31, 2014, based on the CPI for April 2013. However, Shields presented no evidence of the CPI for April 2013. With no evidence of the CPI for April 2013, Shields could not prove the amount of rent due from June 1, 2013, until December 31, 2013, when Shields required Bradberry to vacate the premises. Therefore, Shields failed to prove conclusively that Bradberry owed any more rent than what he had paid when Shields declared the lease terminated for failure to pay the rent as adjusted by the CPI.

Shields also argues that if the extension took effect, then Bradberry was in default because he failed to pay his pro rata share of the property taxes. The 2005 amendment to the lease stated, "from June 1, 2012, on, Tenant shall pay his full pro rata share (3,500/12,417ths) of the property taxes on the entire premises when billed by Principal Realtor or Landlord." It is

undisputed that Shields never billed Bradberry for the property taxes and that Bradberry never paid the property taxes. Because the lease did not require Bradberry to pay the property taxes until he was billed for them, his failure to pay the taxes when Shields never billed him for them was not a breach of the lease.

We conclude Shields has not conclusively established that Bradberry and 40/40 had no right to possession of the premises. We overrule Shields's issue on appeal.

### CONCLUSION

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

140258F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SHIELDS LIMITED PARTNERSHIP, Appellant

No. 05-14-00258-CV      V.

BOO NATHANIEL BRADBERRY AND 40/40 ENTERPRISES, Appellees

On Appeal from the County Court at Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-14-00541-E.
Opinion delivered by Justice Myers. Justices Fillmore and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Boo Nathaniel Bradberry and 40/40 Enterprises recover their costs of this appeal from appellant Shields Limited Partnership.

Judgment entered this 23rd day of June, 2015.